[No. B066399. Second Dist., Div. Four. Oct. 2, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
KAREN DeLAYNE GREENBERGER et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts V. through XI. and XIII. through XIV.

**COUNSEL**

Eric S. Multhaup, Kathy M. Chavez, Kim Malcheski, Vicki I. Podberesky, and Rodger Paul Curnow, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

John R. Gorey, Susan D. Martynec, Brad D. Levenson, Victoria Bedrossian and Shawn A. McGahey, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

WEISBERG, J.*—In the published portion of this opinion we decide that a defendant's declarations against interest may be received in a joint trial without denying the codefendant the right of confrontation guaranteed by the United States Constitution. We further conclude that the trial court properly denied motions of each defendant to sever. We also determine that the trial court properly instructed the jury on the charge of aggravated kidnapping and did not err in refusing to instruct on time-barred lesser offenses. In the unpublished portion of this opinion, with the exception of defendant Lowe's contention that the trial court erred in imposing concurrent sentences, we conclude that the numerous other issues raised by the defendants lack merit. We therefore modify Lowe's judgment by staying the sentence imposed for second degree murder until completion of the term imposed for aggravated kidnapping, at which time the stay is to become permanent, and affirm the judgment as modified. We affirm the judgments as to Greenberger, Mentzer and Marti.

### I. PROCEDURAL HISTORY

The defendants Karen DeLayne Greenberger (Greenberger), William Molony Mentzer (Mentzer), Alex Lomota Marti (Marti) and Robert Ulmer Lowe (Lowe) were tried jointly in a jury trial which commenced on September 4, 1990. The defendants were charged with the following crimes in the amended information: Count 1 alleged the crime of murder in violation of Penal Code[1] section 187, subdivision (a), and count 2 alleged the crime of aggravated kidnapping in violation of section 209, subdivision (a). Count 1 also alleged the special circumstances that the murder was committed for financial gain and during the commission of kidnapping within the meaning of section 190.2, subdivisions (a)(1), (a)(17) and (b). Count 2 alleged that the victim had suffered bodily harm and death. Counts 1 and 2 also alleged that Marti and Mentzer personally used a firearm within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1). Both counts alleged pursuant to section 12022, subdivision (a) that a principal in the commission

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All further statutory references are to the Penal Code unless otherwise stated.

of the offense was armed with a firearm. The victim in both counts was Roy Radin.[2]

On July 19, 1991 the jury found Mentzer and Marti guilty of first degree murder and found the special circumstance allegations that the murder had been committed for financial gain and in the commission of a kidnapping to be true. The jury found Greenberger and Lowe guilty of second degree murder in count 1. The jury found all defendants guilty of aggravated kidnapping resulting in death in violation of section 209, subdivision (a) in count 2. The allegations of personal use of a firearm were found true as to Mentzer and Lowe in both counts, and the allegation of a principal armed with a firearm was found true as to all defendants in both counts.

On October 18, 1991, the penalty phase of the trial resulted in jury verdicts of life in prison without the possibility of parole (LWOP) for Mentzer and Lowe. The trial court sentenced all four defendants to LWOP for count 2. For count 1, Greenberger and Lowe were sentenced to 15 years to life in prison, and Mentzer and Marti were sentenced to LWOP. Enhancements of two years pursuant to section 12022.5 were imposed on Mentzer and Marti. Enhancements of one year pursuant to section 12022, subdivision (a) were imposed on Greenberger and Lowe. The trial court stayed the sentences and enhancements imposed on Greenberger for count 1 and the sentences and enhancements imposed on Mentzer and Marti for count 2 pursuant to section 654 and ordered the sentences in both counts imposed on Lowe to run concurrently.[3] Enhancements of one year pursuant to section 12022, subdivision (a) in count 1 were stayed for Lowe and Marti.

Each defendant filed a timely notice of appeal.[4]

---

[2]The amended information was the product of lengthy pretrial proceedings which will be referred to as necessary in the body of this opinion. Those proceedings included the severance of other counts which alleged that Mentzer and Lowe had committed the murder of June Mincher and the attempted murder of Christian Pierce. Subsequent to the trial of the charges relating to the death of Roy Radin, Mentzer pled guilty to the murder of June Mincher and the attempted murder of Christian Pierce, and on December 5, 1991, he was sentenced to life in prison without the possibility of parole and a consecutive term of two years for personally using a firearm for the murder of Mincher. He received a concurrent sentence of life for the attempted murder of Pierce. Lowe was acquitted by a jury of both offenses.

[3]The judgment states that Lowe's sentence for count 1 was stayed pursuant to Penal Code section 654. The reporter's transcript reflects that the trial court orally imposed concurrent sentences.

[4]Petitions for writ of habeas corpus were filed by Greenberger, Mentzer and Lowe while this appeal was pending. Each petition has been considered and denied by separate order.

## II. THE FACTS

### A. *The Prosecution's Case*

The prosecution presented evidence to support its theory that defendant Greenberger hired defendants Mentzer, Marti and Lowe to kidnap and murder Roy Radin because Radin had cut her out of a Hollywood movie deal and had been involved in the theft of cocaine and money from her house.

#### *Radin-Greenberger Relationship*

Roy Radin (Radin), the victim in both counts, was involved in the entertainment business in New York. He was interested in producing a movie to be called THE COTTON CLUB. The name of the proposed movie derived from a nightclub of the same name. Radin met Greenberger in January 1983 in Los Angeles. Greenberger, who was involved in the illegal distribution of cocaine in Los Angeles, expressed an interest in assisting Radin in his efforts to make THE COTTON CLUB. She also supplied cocaine to him. Greenberger introduced Radin to Tally Rogers, who worked for Greenberger in distributing cocaine. Rogers and Radin became friends.

Greenberger also introduced Radin to Hollywood film producer Robert Evans in April 1983. Evans was also interested in making a movie based on the Cotton Club. If Evans and Radin consummated a deal, Greenberger expected to be paid $50,000 as a finder's fee. Greenberger also hoped to have either financial participation or employment in the production company that would ultimately make the movie.

Radin arranged for financing and conducted negotiations with Evans. Although Evans, who had befriended Greenberger, wanted to allow Greenberger some limited participation in the final contract, Radin refused. This resulted in an emotional confrontation between Greenberger and Radin in April 1983. Evans was interested in buying out Radin and proceeding without him. However, Radin intended to go through with the production with Evans.

#### *Theft From Greenberger*

On April 18, 1983, someone stole 10 kilograms of cocaine and $275,000 in cash from Greenberger's home in Sherman Oaks. Greenberger suspected that Tally Rogers, who had disappeared, had committed this theft. She had received the cocaine from Milan Bellachasses and was afraid that she would be held responsible by Bellachases for the loss of the cocaine and money.

Bellachasses was a major cocaine distributor in Miami and Greenberger's supplier. Upon discovery of the theft Greenberger hired Mentzer as a bodyguard. Marc Fogel had introduced her to Mentzer. Greenberger had supplied cocaine to Fogel in the past.

Greenberger called Radin in New York in late April and told him she was looking for Rogers because he had stolen the money and cocaine from her house. She accused Radin of knowing where Rogers was and of being involved in Rogers's disappearance. Radin became angry and hung up.

### Greenberger-Radin Dinner Date

Radin returned to Los Angeles in early May 1983. Greenberger attempted to reach him by phone, but he refused to accept her calls. She was finally able to speak to Radin's personal assistant, Jonathan Lawson, on May 12. She arranged to meet with Radin the next night so that she and Radin could resolve their dispute over the COTTON CLUB deal at dinner. The same day Greenberger listed her Sherman Oaks home for sale, telling the real estate broker that she was moving to New York to work for Evans.

After Radin agreed to have dinner with Greenberger on May 13, he became concerned for his safety. Radin arranged to have a friend, Demond Wilson, follow him to the restaurant and provide security during the drive to dinner and at dinner. Wilson was to be armed.

### The Plan

On May 13 Mentzer obtained the use of a limousine and another car with the assistance of Marc Fogel. On that same day a meeting occurred at Mentzer's apartment in Los Angeles. Mentzer, Lowe, Marti, Carl John Plzak and Raja Korban were present. Korban and Plzak first met Mentzer, Marti and Lowe when they all worked at an agency that performed vehicle repossessions and private detective services. Plzak worked for Mentzer in April 1983 providing security and surveillance for Greenberger. At that time Greenberger and Mentzer told him that she had been "ripped off for cocaine and money" by Tally Rogers.

While driving to this meeting Marti told Korban that the "fat scumbag" who owed money to a woman was going to be killed. At the meeting Mentzer, in the presence of Lowe and Marti, described the plan to kidnap Radin. Both Plzak and Korban testified at trial under a grant of immunity. They testified that the plan called for Plzak and Korban to wait for Jonathan Lawson, Radin's personal assistant, to leave the hotel as Greenberger met

with Radin that night. Lawson was expected to go to Greenberger's car which was parked near an apartment Greenberger rented in Beverly Hills. Plzak and Korban were to kidnap Lawson who was to be used as leverage to get information from Radin about the location of the money and cocaine. They were to communicate with the others by walkie-talkie about their progress with Lawson.

The plan further called for Lowe to chauffeur Greenberger and Radin in the limousine Mentzer had obtained the previous day. They were to drive from Radin's hotel to a restaurant in Beverly Hills. The plan called for Greenberger to get out of the limousine at some point en route to Beverly Hills and for Mentzer and Marti to get in and force Radin to the floor at gunpoint.

Korban testified that Mentzer told the group that Lowe, Mentzer and Marti would drive Radin to the desert, and they would try to get information from Radin regarding the money owed Greenberger. Once in the desert the plan was to shoot Radin and blow up his face so his corpse could not be identified.

Marti had a gym bag containing a handgun during this meeting. Mentzer had a bag with handcuffs, gloves and small explosives. Mentzer, who said he was being paid a "lot of money" by Greenberger for the job, gave Korban an envelope containing $500 and a similar envelope and a walkie-talkie to Plzak.

### Night of Radin's Death

On May 13 between 7 and 7:30 p.m. Greenberger arranged to have her child and nanny driven to the airport to fly to Miami. Greenberger then arrived at Radin's hotel. Radin and Lawson were in Radin's suite. Greenberger indicated that she hoped that the problems she and Radin had relating to the COTTON CLUB project would be resolved during dinner. Greenberger stated that she had arrived in a limousine that she and Radin would use to go to dinner.

Greenberger asked Lawson to go to her car, which she said was parked nearby at her apartment, and obtain some cocaine from the glove box. Lawson refused. Korban and Plzak waited at Greenberger's apartment for approximately an hour. When Lawson did not appear they left.

At approximately 9:30 p.m. Radin and Greenberger left the hotel and entered Greenberger's chauffeur-driven limousine. Demond Wilson, waiting

outside the hotel, tried to follow the limousine but eventually lost it in traffic. Wilson then went to the restaurant expecting to find Greenberger and Radin there. They never appeared.

Later Greenberger arrived at her apartment by herself and met Korban and Plzak. She drove off with Plzak. She asked Plzak whether he had heard from Mentzer and said that she needed to contact him. Plzak replied that he had not heard from Mentzer. Greenberger then tried unsuccessfully to reach Mentzer by walkie-talkie and telephone. When Plzak told her that Lawson had never appeared at her apartment, Greenberger stated that Lawson had refused to go to her car. Greenberger told Plzak that "they" grabbed Radin and were on the way to the desert. She referred to Radin as "the fat pig" or "the producer." When they parted, Greenberger told Plzak that she was going to set up an alibi and that he should not say he had seen her that night.

Greenberger then met with a friend with whom she stayed for several hours. During this time she made numerous phone calls to Mentzer and Evans, among others.

Lawson spoke to Greenberger by phone several times the night of May 13 and the next day. Greenberger stated she was trying to locate Radin and told Lawson conflicting versions of how she and Radin had separated during the limousine ride en route to the restaurant for dinner.

### The Next Day

Marti called during the morning of May 14 and told Korban that Mentzer wanted Korban to return the $500 because Korban had not earned it. Korban returned the money to Marti that afternoon. Marti told Korban that nothing had happened the preceding night. He stated: "We just roughed him up."

Plzak went to Mentzer's apartment in the early morning of May 14 at Mentzer's request and met with Mentzer and Lowe. Mentzer described to Plzak the events of the previous night. He described how he and Marti had entered the limousine. Mentzer said they thought the police were following them, and they were about to be stopped. He stated that he jammed the gun into "the producer's" mouth and forced him to the floor. Mentzer stated Lowe then drove them to the desert where Mentzer and Marti shot Radin 27 times. They had taken Radin's Rolex watch and gun. Lowe stated to Plzak that he had to walk away from the shooting because he could not watch. Lowe also said that he cleaned the interior of the limousine after the shooting.

Lowe and Plzak then left to return the limousine to the rental office from which it had been obtained. Lowe told Plzak that Radin said that he did not

know where the money was. Both Lowe and Mentzer described Radin as "the fat pig" or "fat pig producer."

### Flight to Florida

During the night of May 14 Greenberger, Mentzer, Lowe, Marti and Plzak flew to Florida in a private plane. Mentzer told Plzak that they had word that Rogers was in Miami.

While in Florida Marti and Plzak drove to a small pond where Marti threw in some towel-covered objects. Marti told Plzak that these were the two .22-caliber guns and silencers used to kill "the fat pig." When Marti told Mentzer that he had discarded the weapons, Mentzer expressed displeasure, saying that the guns could not be traced and that silencers were hard to obtain.

Plzak was paid by Greenberger for security work he did during their stay in Florida.

### Discovery of Radin's Body

Radin was reported missing by his friends in mid-May. A badly decomposed body was discovered June 10, 1983, in Caswell Canyon, a remote area in northern Los Angeles County. The circumstances of the discovery of the body were unconnected to Radin's disappearance. The body was identified as Roy Radin by dental records and fingerprints. There was no jewelry or identification on the body.

Forensic pathological examination of the body disclosed that Radin had been shot numerous times in the head with .22-caliber bullets. The face had been damaged in a manner consistent with an explosive device having been placed in his mouth. The condition of the body was consistent with death having occurred on May 13, 1983.

### Police Investigation

The police investigation included searches of the residences of Mentzer and Marti and a search of storage lockers used by Mentzer. The police located and interviewed Plzak and Korban and used undercover operative William Rider to obtain tape-recorded incriminatory statements from Mentzer and Lowe in 1988. Rider was an acquaintance of Mentzer, Marti and Lowe. Rider had spoken to Marti and Mentzer in 1983, and each had admitted involvement in the Radin murder. Rider testified for the prosecution about the 1983 admissions, and tape recordings of the 1988 conversations with Mentzer and Lowe were played to the jury. The content of these conversations will be set forth in detail below.

Marti also made certain admissions to Estanislau Kreutzer whom Marti employed in 1986-1987 to help him in the distribution of cocaine. Kreutzer was a friend of Marti from Argentina.[5] Kreutzer testified that Marti warned him on numerous occasions in 1986 and 1987 not to steal from him. Marti made veiled references to the murder of Radin by saying that he had been involved in the shooting of a "poor guy" who had stolen $300,000 and 10 kilograms of cocaine, but that he had not been in charge of the murder. Kreutzer observed a photograph on a desk in Marti's house. The photograph depicted Marti holding a gun and standing next to Mentzer. Marti told Kreutzer that the location where the photograph was taken was near Magic Mountain (in the vicinity where Radin's body was discovered) and that he needed to find a new place to dump bodies because that place was full.

Mentzer, Marti, and Greenberger were arrested on October 2, 1988. Lowe was arrested on October 3, 1988.

## B. THE DEFENSE

### Mentzer

At the conclusion of the People's case Mentzer rested without presenting any evidence. He requested that his case be severed and submitted to the jury before the other defendants presented their defense. His request was denied.

### Marti

Marti offered evidence to impeach the credibility of William Rider, Estanislau Kreutzer and Carl Plzak. He presented evidence that Rider used cocaine heavily in 1983, that Plzak made inconsistent statements to a defense investigator about his recollection of the events of 1983 and that Kreutzer attempted to hire Joseph Barbalinardo in 1987-1988 to kill Marti because of the debt owed by Marti. Marti testified in surrebuttal that he was in Florida working for Milan Bellachasses from May 9 to May 20, 1983.

### Lowe

Lowe also presented an alibi. Family members and friends testified that he was in Maryland on May 13 and 14, 1983, and that he left by motor vehicle

---

[5]By the time Kreutzer testified at trial he and Marti were no longer on friendly terms primarily because of debts Marti owed to Kreutzer and Kreutzer's father. Kreutzer admitted to having contacted an individual about having Marti killed because of the debt. In exchange for his testimony Kreutzer was able to settle pending drug cases in federal court for less than the maximum sentence he was facing. He also admitted to having read several articles about the facts of this case before he disclosed information to the prosecution.

for Florida on May 14. His former wife and others also testified that Lowe had a penchant for exaggeration, especially when drinking too much. This was offered to explain his statements to Rider.

Lowe offered evidence to impeach the credibility of Rider. He also presented the testimony of a federal probation officer who testified that he was the probation officer for Gary Keys, Greenberger's regular driver, and had spoken to Keys in 1983 about a homicide. Keys told the probation officer that he had driven a group of men to a hilly area overlooking the ocean. The men dragged an individual screaming from the limousine, returned later without the individual who had been screaming and one stated, "You didn't see anything."

### Greenberger

Greenberger presented the testimony of Tim Whitehead, who worked for her in the cocaine distribution business. Whitehead described efforts to locate Tally Rogers, who he and Greenberger believed had stolen the cocaine and money from Greenberger's house. He testified that he and Greenberger were afraid that they would be killed by their cocaine source if they did not find the stolen money and drugs. Greenberger introduced him to Mentzer, Marti and Lowe on April 20. He described phone conversations between Mentzer and Milan Bellachasses, the cocaine supplier in Florida who had threatened to hold Greenberger and Whitehead responsible if they did not find Rogers.

Whitehead described going to Memphis on April 23 with Mentzer, Lowe and Marti to look for Rogers. They discussed firebombing Rogers's house. Mentzer, Marti and Lowe put gasoline into glass jars to carry out the plan, which was eventually abandoned. Whitehead also testified that he went to Mississippi with Lowe to kidnap Rogers's mother but they abandoned this as well.

Whitehead testified he was in Miami in early May with Mentzer and Marti and talked with Bellachasses about how to find Rogers. At one point Mentzer stated that they had located Rogers through Radin's records. Bellachasses told Mentzer and Marti to go to California and talk to Radin.

Greenberger testified in her own behalf. She admitted distributing cocaine for her one-time boyfriend Bellachasses. She described the theft of cocaine and money from her house and her fear that she would be killed by the Colombians who supplied the cocaine to Bellachasses. She testified about efforts to find Tally Rogers and recover the stolen drugs and money.

Greenberger testified about hiring Mentzer to find Rogers and to furnish security for her. Mentzer brought in Lowe, Marti and Plzak to assist. She described their efforts at Bellachasses's direction to find Rogers.

Greenberger also described how she met Radin and had introduced Rogers to Radin. She testified about meeting Robert Evans and putting Evans and Radin together for the COTTON CLUB project. She described the negotiations involved in the project and how she anticipated being a partner with Radin. She also described her relationship with Evans who wanted her to work with him in film production.

Greenberger testified that she believed that Radin had been involved in the theft of the money and cocaine. This belief was based upon information she had received from Bellachasses and Mentzer who told her that phone calls to Rogers had been traced to Radin's hotel room in Beverly Hills.

She contacted Jonathan Lawson to set up a dinner date with Radin to discuss the movie deal. Bellachasses told her he wanted Mentzer to talk to Radin about what he knew about Rogers. Greenberger testified that she made arrangements to sell her house because she planned to move to New York and work for Evans. She testified that her son's flight to Florida had been planned as part of a birthday celebration, and she had planned to join him after her meeting with Radin.

On May 13 Lowe drove her in the limousine to the hotel where Radin was staying. At the hotel she, Lawson and Radin used cocaine. Radin wrote her a check for her role in introducing him to Evans. She testified that she did ask Lawson to pick up something from her car, and Lawson refused. She testified that Mentzer had directed her to do this as a ruse to get Lawson out of the hotel room.

Greenberger testified Radin became boisterous and belligerent after they left the hotel. She and Radin were being driven in the limousine by Lowe. She did not know they were being followed. The car suddenly turned off Sunset Boulevard onto a side street, and the two back doors opened simultaneously. Mentzer was there, and he told her to go to her Beverly Hills apartment. She testified that she complied because she was confused and did not know what to think. She saw Mentzer the next day, and he told her that Radin had a gun and had intended to kill her, but that they had killed him first. She then left town; went to Florida and thereafter moved around quite a bit. It was her belief that Bellachasses had hired Mentzer to kidnap Radin.

### III. Declarations Against Interest

#### A. *Background*

*Statements Made to William Rider*

William Rider was an acquaintance of Mentzer, Marti and Lowe. Rider was a former police officer and had been in charge of security for his former brother-in-law Larry Flynt in Los Angeles. He had hired Mentzer, Marti and Lowe to work for him between 1979 and 1982. He had also met Greenberger in 1983 in Mentzer's apartment.

*Statements Made in 1983*

Rider testified about statements Marti and Mentzer made to him in 1983 in which they implicated themselves in the murder of Radin. This testimony was received over objection of each defendant as declarations against interest. Although the subject of objection in the trial court, the admission of these statements is not challenged in this appeal.

Rider testified that he was alone with Mentzer in the first half of 1983 at Flynt's estate in Bel-Air, and Mentzer said he had "just done a hit and had dumped the body" in a location Rider and Mentzer had used for target practice, a location consistent with the location in which Radin's body was discovered.

Rider testified that he then had a conversation with Marti at Flynt's estate. He and Marti were alone. He testified that Marti told him that he had shot first and Mentzer second and that "Mentzer had to drink a pint of wine because he was afraid or reluctant before they did the hit." In a subsequent conversation Rider testified, Marti told him that "he hated Jews and that he enjoyed shooting the big fat Jew."[6]

Rider also testified that Marti and Mentzer showed him a newspaper article about the discovery of Radin's body. In a later conversation with Marti and Mentzer, Marti offered to sell Radin's Rolex watch to Rider. During this conversation Marti referred to Radin as "big fat Rodan." Rider also testified that Mentzer, in a conversation outside the presence of Marti, stated that he had used a .22-caliber semiautomatic weapon and that Robert Evans had paid for the murder.

---

[6]Marti objected under Evidence Code section 352 to the ethnic nature of the statement. The trial court concluded that the probative value of the statement was not outweighed by its potential prejudice. This is the subject of a separate argument made by Marti which is dealt with elsewhere in this opinion.

## Statements Made in 1988

Rider was recruited by the police in 1988 to assist in their investigation. He was paid by the police and was also provided security. Rider met with Lowe in Maryland on May 10, 1988, and surreptitiously tape-recorded a conversation with him. Rider met with Mentzer on July 7, 1988, at a hotel in Los Angeles. This conversation was also surreptitiously tape-recorded. Redacted versions of the tape recordings were played, and transcripts were provided to the jury.[7] Some of Lowe's statements implicated Mentzer, and some of Mentzer's statements implicated Marti and Lowe.

The trial court dealt with the admissibility of these statements in various pretrial motions. The issue was one ground for motions to sever on behalf of Mentzer, Marti and Lowe. The People had initially taken the position that redaction of these statements to remove reference to nondeclarant defendants could be accomplished so that the right of confrontation of the nondeclarants would not be compromised and severance would not be required.

Hearings were conducted and rulings were made on just how the redactions would be implemented. Later, the People changed their position and argued that these statements were admissible against both the declarant and the nondeclarants as declarations against interest. Thereafter, the trial court conducted additional hearings and admitted some of these statements over the objections of the nondeclarant defendants. The trial court concluded that the statements were admissible pursuant to Evidence Code section 1230[8] as declarations against interest.

Mentzer, Marti and Lowe each contend that the trial court committed reversible error in admitting these statements because their admission denied the nondeclarant the right of confrontation guaranteed by the United States Constitution. They further argue that admission of these statements was contrary to the holdings of the United States Supreme Court in *Bruton* v.

---

[7]The playing of the tape for the jury occurred during the testimony of Detective Stoner who had supervised the surreptitious recordings and authenticated the tapes. Rider had completed his testimony but was still available for further cross-examination by the defendants had they chosen to recall him.

[8]Section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

*United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476] and the California Supreme Court in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. They also argue that failure to sever their trial from that of the declarant defendant constituted reversible error. Respondent argues that these statements were properly received as declarations against interest.

The question thus presented is whether the statements of a defendant may be received in a joint trial although they implicate the codefendant if the statements meet the requirements of the hearsay exception for declarations against interest. This requires the answering of subsidiary questions: (a) Does admission of a declaration against interest deny a nondeclarant defendant the right of confrontation guaranteed by the United States Constitution? (b) If it does not, is the answer the same if the declarant is a codefendant?

### B. *Discussion*

### 1. *Confrontation Clause*

■ The Sixth Amendment's confrontation clause, which is applicable to the states through the Fourteenth Amendment (*Pointer* v. *Texas* (1965) 380 U. S. 400, 403-405 [85 S.Ct. 1065, 1067-1068, 13 L.Ed.2d 923], provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The confrontation clause "reflects a preference for face-to-face confrontation at trial . . ." which is accomplished through cross-examination of witnesses. (*Ohio* v. *Roberts* (1980) 448 U.S. 56, 62-63 [100 S.Ct. 2531, 2537, 65 L.Ed.2d 597].) "In short, the Clause envisions [¶] 'a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " (*Id.* at pp. 63-64 [100 S.Ct. at pp. 2537-2538], quoting *Mattox* v. *United States* (1895) 156 U. S. 237, 242-243 [15 S.Ct. 337, 339, 39 L.Ed. 409].)

■ However, the Supreme Court has recognized that there are competing interests that justify dispensing with confrontation at trial in certain circumstances and permitting the introduction of hearsay evidence. "Significantly, every jurisdiction has a strong interest in effective law enforcement, and in the development and precise formulation of the rules of evidence applicable in criminal proceedings." (*Ohio* v. *Roberts, supra,* 448 U.S. at p. 64 [100 S.Ct. at p. 2538].) The court has accommodated these competing

interests in a process that has "been gradual, building on past decisions, drawing on new experience, and responding to changing conditions." (*Ibid.*)

The *Roberts* court recognized the two means by which the confrontation clause restricts the range of admissible hearsay. First, the proponent of the evidence must establish the necessity for the introduction of this evidence. This usually, but not always, means that the declarant is unavailable. Second, the hearsay must have adequate indicia of reliability to justify dispensing with the requirement of confrontation. "The Court has applied this 'indicia of reliability' requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection.' . . . [¶] . . . Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (*Ohio* v. *Roberts*, *supra*, 448 U.S. at p. 66 [100 S.Ct. at p. 2539], citation and fn. omitted.)

"Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." (*Idaho* v. *Wright* (1990) 497 U.S. 805, 817 [110 S.Ct. 3139, 3147, 111 L.Ed.2d 638].)

In assessing whether hearsay evidence which does not fall within a firmly rooted exception possesses "particularized guarantees of trustworthiness" the totality of the circumstances surrounding the making of the statement which render the declarant particularly worthy of belief must be examined. "In other words, if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." (*Idaho* v. *Wright*, *supra*, 497 U.S. at p. 820 [110 S.Ct. at p. 3149].)

### 2. *Declarations Against Interest*

The hearsay exception for declarations against interest was recognized in California in *People* v. *Spriggs* (1964) 60 Cal.2d 868, 874 [36 Cal.Rptr. 841, 389 P.2d 377]. Although the *Spriggs* court acknowledged that the majority of jurisdictions did not then permit this exception to the hearsay rule, it reasoned that ". . . a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest . . ." thereby giving the statement a high degree of trustworthiness justifying its admission in evidence. (*Id.* at p. 874.) The rule was codified as

section 1230 of the Evidence Code in 1967 with the additional requirement that the declarant be unavailable as a witness.

The extent of this hearsay exception was defined in *People* v. *Leach* (1975) 15 Cal.3d 419, 441 [124 Cal.Rptr. 752, 541 P.2d 296]. The court concluded that, "[i]n the absence of any legislative declaration to the contrary," not all statements which implicate the declarant are admissible against the nondeclarant. (*Id.* at p. 441.) Only those statements or portions of statements that are specifically disserving of the penal interest of the declarant were deemed sufficiently trustworthy to be admissible. Statements not specifically disserving were characterized as "collateral" statements and inadmissible.

The California Supreme Court has recently dealt with the scope of Evidence Code section 1230. In *People* v. *Gordon* (1990) 50 Cal.3d 1223 [270 Cal.Rptr. 451, 792 P.2d 251] defendant Gordon was prosecuted for robbery and murder. Gordon, who had been shot during the commission of the crime, fled with his crime partners across the country. They ultimately arrived in Georgia where they met Dennis Rauch. Rauch assisted Gordon in caring for his wounds. Rauch was subsequently arrested and made a statement which provided very damaging information about Gordon. Rauch was unavailable at the trial, and his statement to the police was presented to the jury as a declaration against his penal interest over Gordon's hearsay objection. Gordon argued that Rauch's statement should be characterized as "neutral or exculpatory" and unreliable. (*Id.* at p. 1252.) Since Gordon had not asserted in the trial court that admission of Rauch's statement denied him the right of confrontation, the Supreme Court confined its ruling to the issue of whether the statement constituted a declaration against Rauch's penal interest. Although the statement not only implicated Rauch as an accessory after the fact but also incriminated Gordon in the robbery and murder, the California Supreme Court upheld the trial court's exercise of discretion in admitting the statements. The high court concluded that the circumstances surrounding the statement and its content provided sufficient indicia of reliability for the trial court to admit the statement. (*Id.* at pp. 1251-1253; see also *People* v. *Wilson* (1993) 17 Cal.App.4th 271, 276 [21 Cal.Rptr.2d 420].)

The United States Supreme Court in *Williamson* v. *United States* (1994) 512 U.S. 594 [114 S.Ct. 2431, 129 L.Ed.2d 476] interpreted rule 804(b)(3) of the Federal Rules of Evidence (28 U.S.C.) in much the same fashion as the California Supreme Court interpreted Evidence Code section 1230 in *Leach*.[9] The court echoed the reasoning of *Spriggs, Leach*, and *Gordon*, in

---

[9]Federal Rules of Evidence (hereafter F.R.E.) rule 804(b)(3) makes admissible " 'statement[s] which . . . at the time of [their] making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have

observing that this exception to the hearsay rule is "founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." (*Williamson* v. *United States, supra,* 512 U.S. at p. 599.) However, this reasoning only applies to declarations within a confession that are individually self-incriminatory and not to statements that are collateral to them. "The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." (*Id.* at pp. 599-600 [114 S.Ct. at p. 2435].)

"There are many circumstances in which [the] Rule . . . does allow the admission of statements that inculpate a criminal defendant. Even the confessions of arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor." (*Williamson* v. *United States, supra,* 512 U.S. at p. 603 [114 S.Ct. at p. 2436].)

The court expressly stated that it did not address whether the declaration against interest exception to the hearsay rule was " 'firmly rooted' " for confrontation clause purposes, noting that there is a split in federal circuit courts on this issue. (*Williamson* v. *United States, supra,* 512 U.S. at p. 605 [114 S.Ct. at p. 2437].) However, the court did note that "the very fact that a statement is genuinely self-inculpatory—which our reading of Rule 804(b)(3) requires—is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." (*Ibid.*)

The parties herein disagree whether the California hearsay exception for declarations against penal interest is firmly rooted. However, this is not a dispute that requires resolution here.[10] ■ In order for a statement to qualify as a declaration against penal interest the statement must be genuinely and specifically inculpatory of the declarant; this provides the "particularized guarantee of trustworthiness" or "indicia of reliability" that permits its admission in evidence without the constitutional requirement of cross-examination. Therefore, the determination that the statement falls within this hearsay exception also satisfies the requirements of the confrontation clause.

made the statement[s] unless believing [them] to be true.' " (*Williamson* v. *United States, supra,* 512 U.S. at p. 599 [114 S.Ct. at p. 2434].)

[10]See *People* v. *Wilson, supra,* 17 Cal.App.4th at page 278, decided by Division Five of this court, holding that it is firmly rooted.

(See *People* v. *Wilson, supra,* 17 Cal.App.4th at p. 278 and *U.S.* v. *York* (7th Cir. 1991) 933 F.2d 1343, 1361-1363.)

Mentzer, Marti and Lowe point out that California cases have applied an additional restriction on the admissibility of declarations against penal interest. These cases state that even if the declaration meets the requirements of Evidence Code section 1230, it must be excluded if it "goes to the heart of the case, if it is 'crucial' or 'devastating' to the defendant[.]" (*People* v. *Coble* (1976) 65 Cal.App.3d 187, 195 [135 Cal.Rptr. 199]; see also *People* v. *Bullard* (1977) 75 Cal.App.3d 764, 771 [142 Cal.Rptr. 473]; *People* v. *Claxton* (1982) 129 Cal.App.3d 638, 666 [181 Cal.Rptr. 281]; *People* v. *Frutos* (1984) 158 Cal.App.3d 979, 986 [205 Cal.Rptr. 204]; *People* v. *Rios* (1985) 163 Cal.App.3d 852, 867 [210 Cal.Rptr. 271].)

The origin of this limitation is found in *Coble*'s reference to language in the plurality opinion of *Dutton* v. *Evans* (1970) 400 U.S. 74, 86-88 [91 S.Ct. 210, 218-219, 27 L.Ed.2d 213], in which the Supreme Court upheld Georgia's unusually broad hearsay exception for coconspirator statements. However, the court in *Coble* misread *Dutton* in concluding that otherwise admissible hearsay statements are inadmissible if found to be crucial or devastating to the nondeclarant's case. This was not the holding of *Dutton*. Further, appellants have cited no federal case holding that this confrontation clause limitation has been imposed in the federal courts.[11] Indeed, as we discuss *post*, the federal cases admit such evidence without limitation. Since the *Coble* restriction on admissibility of evidence is based upon an erroneous assessment of the requirements of the confrontation clause rather than an interpretation of California law relating to hearsay, it runs afoul of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)), which mandates, with certain exceptions, the admission of all relevant evidence not otherwise excluded by the United States Constitution. We disapprove the limitation set forth in *Coble*.

We conclude that admission of a statement possessing sufficient indicia of reliability to fall within the hearsay exception of a declaration against penal

---

[11]The *Dutton* language "could indicate the Court's inclination to hold that admission of the challenged testimony, even if in violation of the Constitution, was harmless error beyond a reasonable doubt." (*United States* v. *Eaglin* (9th Cir. 1977) 571 F.2d 1069, 1082, fn. 15.) In reference to this same language, the Ninth Circuit has stated: "No holding of any case brought to our attention has turned on the application of this standard." (*United States* v. *King* (9th Cir. 1976) 552 F.2d 833, 846, fn. 16.) (See *State* v. *Barber* (1984) 38 Wn.App. 758, 767-768 [689 P.2d 1099, 1106] [". . . if the witness is unavailable and the hearsay evidence reliable, *its* admission does not violate a defendant's right of confrontation regardless of whether it is 'crucial' or 'devastating.' "] and *State* v. *Edmondson* (1986) 43 Wn.App. 443, 453-454, 717 P.2d 784, 791].)

interest does not deny a defendant the right of confrontation guaranteed by the United States Constitution.

### 3. *Joint Trials*

The United States Supreme Court concluded in *Bruton* v. *United States*, *supra*, 391 U.S. at page 125 [88 S.Ct. at page 1622] that admission of extra-judicial statements of a codefendant in a joint trial violated the non-declarant's right of cross-examination secured by the confrontation clause of the Sixth Amendment even though the statement was received only against the declarant. The court reasoned that limiting instructions, while useful in many situations, cannot adequately ensure that the jury will not use this evidence in deciding the case of the nondeclarant.[12] The court concluded: "The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed." (*Id.* at p. 136 [88 S.Ct. at p. 1628].) *Roberts* v. *Russell* (1968) 392 U.S. 293 [88 S.Ct. 1921, 20 L.Ed.2d 1100] extended the holding of *Bruton* to prosecutions under state law.

■ Appellants argue that *Bruton* is an absolute bar to introduction of statements of one defendant that implicate another when the defendants are tried jointly. They argue that labeling the declarant's statement a declaration against interest does not diminish the prejudicial impact on the codefendant which the holding of *Bruton* was intended to prevent.

The trial court took the opposite position when it concluded that the statements complained of were admissible as declarations against interest. Respondent, relying upon the trial court's ruling that the statements were properly admissible, argues that there was no violation of the nondeclarant's right of confrontation.

A careful reading of *Bruton* and its progeny reflects a body of law which has dealt with the use of limiting instructions to prevent inadmissible and highly prejudicial evidence from infecting the case of the jointly tried

---

[12]The California Supreme Court had anticipated the holding of *Bruton* in *People* v. *Aranda*, *supra*, 63 Cal.2d at page 529 which announced a rule of procedure for joint criminal trials. The court held that the practice of permitting joint trials when the confession of one defendant is admitted in evidence with limiting instructions was prejudicial and unfair to the non-declarant defendant. In recognition of the passage of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)), the California Supreme Court has stated that the rule of *Aranda* was abrogated to the extent it required exclusion of relevant evidence that need not be excluded under federal constitutional law. (*People* v. *Fletcher* (1996) 13 Cal.4th 451, 464 [53 Cal.Rptr.2d 572, 917 P.2d 187].)

codefendant. *Bruton* does not stand for the proposition that all statements of one defendant that implicate another may not be introduced against all defendants in a joint trial. The *Bruton* opinion itself stated that the offending hearsay statement in that case was clearly inadmissible against the non-declarant under traditional rules of evidence, and that there was no recognized exception to the hearsay rule for its admission. The court went on to state that "we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." (*Bruton* v. *United States*, *supra*, 391 U.S. at p. 128, fn. 3 [88 S.Ct. at p. 1628].)

In *Lee* v. *Illinois* (1986) 476 U.S. 530 [106 S.Ct. 2056, 90 L.Ed.2d 514] the court dealt with confessions made by each defendant implicating the other and used as substantive evidence against both tried jointly. The court observed that ". . . this is not strictly speaking a *Bruton* case because we are not here concerned with the effectiveness of limiting instructions in preventing spill-over prejudice[.]" (*Id.* at p. 542 [106 S.Ct. at page 2063].) The court concluded that, although such confessions were presumed to be unreliable, the presumption could be rebutted if the confession is shown to have particularized guarantees of trustworthiness. (*Id.* at p. 543 [106 S.Ct. at page 2063].) The dissenting opinion of Justice Blackmun pointed out that "[t]he *Bruton* rule thus necessarily applies only to situations in which the out-of-court statements are constitutionally inadmissible against the defendant." (*Id.* at p. 552, fn. 5 [106 S.Ct. at p. 2064]; see also, *U.S.* v. *York*, *supra*, 933 F.2d at p. 1362, fn. 3 ["Bruton only prohibits the use of an inculpatory hearsay statement against an accused when the jurisdiction's rules of evidence do not permit that statement to be introduced into evidence against the accused. Where the rules so permit, Bruton is inapplicable."].)

Since declarations against interest may be admitted in evidence without doing violence to the confrontation clause, we see no reason why such declarations, when made by a codefendant, should not also be admissible. This is not to say that all statements which incriminate the declarant and implicate the codefendant are admissible. Any such statement must satisfy the statutory definition of a declaration against interest and likewise satisfy the constitutional requirement of trustworthiness. This necessarily requires a "fact-intensive inquiry, which would require careful examination of all the circumstances surrounding the criminal activity involved; . . ." (*Williamson* v. *United States*, *supra*, 512 U.S. at p. 604 [114 S.Ct. at p. 2437].) There is nothing in *Bruton* which prohibits introduction of such evidence.

The court in *U.S.* v. *Hamilton* (7th Cir. 1994) 19 F.3d 350, came to the same conclusion. The court determined that admission of one defendant's extrajudicial statements implicating himself and the codefendant did not

violate the codefendant's right of confrontation so long as the declaration met the requirements of F.R.E. rule 804(b)(3). The *Hamilton* case was a federal prosecution for bank robbery. Hamilton and Miller were tried jointly. Miller contended that the trial court had admitted evidence that violated his Sixth Amendment right of confrontation. The evidence complained of consisted of statements Hamilton had made to a cellmate while awaiting trial in which he provided a detailed account of how he and Miller had committed the charged robbery. The *Hamilton* court concluded that *Bruton* was not a barrier to admission of this hearsay evidence so long as the evidence was admissible under F.R.E. rule 804(b)(3). The statements were then analyzed and determined to be admissible. (19 F.3d at pp. 354-357; see also *U.S.* v. *Curry* (7th Cir. 1992) 977 F.2d 1042.)

In *U.S.* v. *Matthews* (2d Cir. 1994) 20 F.3d 538 the court came to a similar conclusion. Matthews and Prater were tried jointly for bank robbery. Prater's extrajudicial statements to his girlfriend were admitted over Matthews's Sixth Amendment objections that such evidence denied him his right of confrontation. As in *Hamilton* the statement consisted of a detailed account of how Prater and Matthews had committed the robbery. The court concluded: "Given the totality of the circumstances as to the content and context of Prater's statements, we conclude that those statements had sufficient 'particularized guarantees of trustworthiness' that their admission against Matthews did not violate Mathews's rights under the Confrontation Clause." (*Id.* at p. 546.)

In *U.S.* v. *Sasso* (2d Cir. 1995) 59 F.3d 341, a federal firearms prosecution, Sasso and Armienti were tried jointly. Armienti made prearrest statements to his girlfriend which implicated Sasso and himself. The court explained that examination of the circumstances of the statement must be undertaken to determine whether the portions implicating the nondeclarant were reliable. Upon such an examination the statements, as in *Matthews* and *Hamilton*, were found to be reliable, admissible and nonviolative of the nondeclarant's right of confrontation. The court recognized it had decided *Matthews* before the Supreme Court's decision in *Williamson*, but concluded that the views expressed in both are consistent. The court observed that *Matthews* stressed the need to examine the statement in question to determine whether there were particularized guarantees of trustworthiness surrounding the statement, such as no effort to shift responsibility, and not mere reliance upon the fact that portions of the statement that incriminated the nondeclarant were in close proximity to statements inculpatory of the declarant. (*U.S.* v. *Sasso, supra,* 59 F.3d at pp. 348-350; see also *Earnest* v. *Dorsey* (10th Cir. 1996) 87 F.3d 1123, 1130-1134, cert. den. __ U.S. __ [117 S.Ct 527, 136 L.Ed.2d 414].)

The cases cited by appellants are not persuasive. Indeed, the case of *U.S. v. Flores* (5th Cir. 1993) 985 F.2d 770 supports respondent's position. In *Flores*, the government had offered against both defendants the postarrest grand jury testimony of one defendant. The court concluded that such evidence, because of the strong possibility that the declarant would shift blame or curry favor, was inherently unreliable and inadmissible. (*Id.* at pp. 777-780.) However, the court went on to say that "even generally objectionable statements in which the declarant adversely implicates not only his own penal interest but also that of another may be made under circumstances that both suggest reliability and do not seriously invade the intended protections of the Confrontation Clause, such as statements made to a personal acquaintance in a noninvestigatory context where the setting suggests no motive to speak falsely. . . . Such statements might well fall [within] the *Lee* category of those shown to have 'particularized guarantees of trustworthiness.' " (*Id.* at p. 780, quoting *Lee v. Illinois, supra,* 476 U.S. at p. 543.)

Marti also cites *United States v. Battiste* (N.D. Ill. 1993) 834 F.Supp. 995 in which the district court disapproved of higher court opinions in the Seventh Circuit. However, cases decided in that circuit after *Battiste,* such as *Hamilton, supra,* continue to support admission of such evidence. We find the reasoning of *Matthews, Hamilton, Sasso, Gordon* and *Wilson* persuasive. The balance of the authority cited by appellants addresses the issue of trustworthiness which is an individualized inquiry intimately related to the facts of each case. As appropriate, these cases will be discussed, *post,* in relation to the analysis of the circumstances of the statements herein.

We therefore conclude that a declaration against interest may be admitted in a joint trial so long as the statement satisfies the statutory definition and otherwise satisfies the constitutional requirement of trustworthiness.

### 4. *Were the Statements Declarations Against Interest and Trustworthy?*

 There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. (See *People v. Frierson* (1991) 53 Cal.3d 730, 745 [280 Cal.Rptr. 440, 808 P.2d 1197]; *People v. Cudjo* (1993) 6 Cal.4th 585, 607 [25 Cal.Rptr.2d 390, 863 P.2d 635]; *Dutton v. Evans, supra,* 400 U.S. at pp. 88-89 [91 S.Ct. at p. 219]; *Idaho v. Wright, supra,* 497 U.S. at p. 819 [110 S.Ct. at pp. 3148-3149]; *Williamson v. United States, supra,* 512 U.S. 594, 601 [114 S.Ct. 2431, 2435. ].)

Clearly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. "Once partners in crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices." (*Lee* v. *Illinois, supra,* 476 U.S. at p. 544 [106 S.Ct. at p. 2064].) However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. (*U.S.* v. *Flores, supra,* 985 F.2d at p. 780; *U.S.* v. *Matthews, supra,* 20 F.3d at p. 546; *U.S.* v. *Sasso, supra,* 59 F.3d at p. 349.)

When examining what was actually said by the declarant special attention must be paid to any statements that tend to inculpate the nondeclarant. This is so because a statement's content is most reliable in that portion which inculpates the declarant. It is least reliable in that portion which shifts responsibility. Controversy necessarily arises when the declarant makes statements which are self-inculpatory as well as inculpatory of another. This is why Evidence Code section 1230 only permits an exception to the hearsay rule for statements that are specifically disserving of the declarant's penal interest. (*People* v. *Leach, supra,* 15 Cal.3d at p. 441.) This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest. Such a determination necessarily depends upon a careful analysis of what was said and the totality of the circumstances. (*People* v. *Wilson, supra,* 17 Cal.App.4th at p. 276 ["The fact that the statement is also disserving to [nondeclarant] does not render the statement unreliable and inadmissible. . . ."]; *U.S.* v. *Sasso, supra,* 59 F.3d at 349; *People* v. *Gordon, supra,* 50 Cal.3d at pp. 1252-1253.)

■ Determination of whether a statement is trustworthy is entrusted to the sound discretion of the trial court. In reviewing the trial court's rulings we apply the abuse of discretion standard. (*People* v. *Gordon, supra,* 50 Cal.3d at pp. 1250-1253.) "The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion. Of course, we review the specific determinations underlying the court's ruling under the standards appropriate thereto." (*Id.* at p. 1251.) "It follows that a determination whether the declaration is indeed against interest should itself be reviewed for abuse of discretion: that issue goes to the core of the question of basic trustworthiness, and hence must be deemed entrusted to the court's discretion." (*Id.* at p. 1252.) (Cf. *United States* v. *Monaco* (9th Cir. 1984) 735 F.2d 1173, 1176.)

■ In determining the particularized guarantees of trustworthiness, consideration of corroborating evidence is inappropriate since that would constitute "bootstrapping on the trustworthiness of other evidence at trial." (*Idaho* v. *Wright, supra,* 497 U.S. at p. 823 [110 S.Ct. at p. 3150].)

The trial court conducted extensive hearings to determine whether the statements herein would be admissible. The court stated its understanding of the need to examine the circumstances and context in which the statements were made as well as their content. In addition to the tapes and their transcripts the court considered the preliminary hearing transcripts. Portions of the statements were excluded on various grounds, including lack of reliability, absence of personal knowledge of the declarant, and the fact that they were not specifically disserving of the declarant's interest. Some were excluded as cumulative.

It is not disputed that Mentzer and Lowe were unavailable as witnesses to both the prosecution and to the nondeclarant defendants. (Evid. Code, § 240, subd. (a)(1); *People* v. *Leach, supra,* 15 Cal.3d at p. 438.)

### a. *Lowe-Rider Statements About Mentzer*[13]

■ The conversation in 1988 between Lowe and Rider contained references to Mentzer (Bill). Mentzer contends that the circumstances of that conversation make any references to him unreliable. The conversation occurred in a bar. Both Lowe and Rider had been drinking. Mentzer argues that Lowe was intoxicated. Mentzer also argues that Lowe was motivated by a desire to impress Rider. These were all factors the trial court considered and rejected. Mentzer also contends that evidence presented during Lowe's defense established that Lowe had a habit of exaggeration. However, respondent correctly points out that this evidence was not presented to the trial court prior to the time the court ruled on the admissibility of the statement and the statement was received in evidence. Since Mentzer failed to raise this issue in the trial court, he is foreclosed from doing so here.

The specific statements Mentzer objects to are: "And - you know what? Have you been with Bill on a - on a - homicide? . . . Have you been with Bill on a homicide? You have not. The mother fucker gets drunk. . . . Oh, I'm not saying who it was, I'm just saying the fucker gears himself up to get the balls to do it. And that ain't. . . . Friday the 13th they shot him 13 times." These statements were made shortly before Lowe acknowledged that he drove the car during the Radin kidnapping and described how he had been compensated for his participation.

---

[13]See attachment 1, which contains relevant excerpts of the transcript of the tape recording in question. The portions in bold type are specific references to which Mentzer assigns error.

Mentzer argues that Lowe's statements were not specifically disserving of Lowe's penal interest since Lowe initially denied his involvement to Rider and then indicated he only drove the car and had been paid. Mentzer argues that references which inculpated him were collateral to anything incriminating of Lowe and should have been excluded by the trial court. Respondent argues that the statement must be viewed in context, and that what Lowe said disclosed that he had been paid for driving the car involved in the murder and that he was present at the murder scene with Mentzer, all highly self-incriminating declarations. Respondent contends that Lowe's reference to Mentzer was merely part of this self-incriminating statement.

The trial court considered the circumstances of the conversation between Lowe and Rider and each of the statements uttered by Lowe. The trial court stated: "I think that based on the totality of the evidence now before me. . . . I think this is the type of situation where considering the relationship between the parties, the circumstances of the discussion, and the context of the statements I do think it's reliable and I don't find anything about the drinking that made it unreliable. If anything, [sic] probably talked more loosely than he otherwise would have. And there are indications at times these [sic] actually happened. For example, there is at least one occasion where he initially denies involvement and then proceeds to admit. So, I think based on the totality of what I have before me I do find that it is trustworthy and reliable." It is also clear from the record that the trial court was fully aware of the requirement that such statements must be specifically disserving of the declarant to qualify under Evidence Code section 1230 as declarations against penal interest when it ruled the statements admissible.

We agree with the trial court's assessment that at the time Lowe made the statements about having "been with Bill on a homicide" and "they shot him 13 times" and describing how he had been paid for driving the car, the statements were specifically disserving of Lowe's penal interest because they subjected Lowe to the risk of criminal liability to such an extent that a reasonable person in his position would not have made them unless he believed them to be true. We also find the trial court could have reasonably concluded that the circumstances of the conversation provided sufficient indicia of reliability to ensure that the statements were trustworthy. We find no abuse of discretion in admitting the portion of Lowe's statement which implicated Mentzer. (See *People* v. *Gordon, supra,* 50 Cal.3d at p. 1252-1253.)

### b. *The Mentzer-Rider Conversations*

The conversations between Mentzer and Rider in 1988 contained references to both Marti (Alex) and Lowe (Bob). Marti and Lowe argue that

the circumstances of the conversations do not support the trial court's finding that the statements in question were trustworthy. They contend that Mentzer was motivated to agree with whatever Rider said because he wanted to work for Rider. Marti and Lowe argue that the only way they could have explored this issue would have been to cross-examine Mentzer, who was unavailable as a witness. Lowe also argues in his written brief that the conversation was "redolent with classic male-to-male 'stag' talk, i.e., 'B.S.' which was [and is] notoriously unreliable and untrustworthy." Lowe's counsel conceded to the trial court that Mentzer did not know that Rider was actually working as a police undercover operative when these conversations occurred.

During the hearing relating to admissibility of these statements the trial court stressed that it considered the entire circumstances of the conversation. The court observed that Mentzer regarded Rider as a friend and that the conversation occurred in a noncoercive atmosphere. The trial court contrasted this situation with that in which an arrestee attempts to shift responsibility to another and curry favor with the police. The trial court found sufficient indicia of reliability in the totality of the circumstances to conclude that the statements were trustworthy. In addition to evaluating the circumstances of the conversations, the trial court conducted a hearing to determine whether statements that implicated Lowe and Marti were admissible as declarations against Mentzer's penal interest. Each statement was discussed in detail.

### c. *Mentzer-Rider Statements About Marti*[14]

██ Marti contends that the trial court erred in admitting anything said by Rider or Mentzer. He further argues that the trial court's rulings deprived him of his right of confrontation.

Marti argues that there was no evidentiary basis for admission of Rider's statements. He contends that Rider's statements were received as adoptive admissions of Mentzer, and since Mentzer had no interest in disavowing incriminating references Rider made about Marti those references constituted inadmissible hearsay as to Marti. He argues that the rationale for the hearsay exception for adoptive admissions only extends to matters a person would reasonably be expected to deny if untrue, but such expectation does not exist in regard to assertions of another's wrongdoing. Respondent argues

---

[14]See attachment 2, which contains those portions of the transcript to which Marti assigns error. The portions in bold type are the specific statements about which Marti complains. In his opening brief Marti argues that the entire trial was rife with *Bruton* error. However, he has only set forth with specificity these portions of the 1988 Mentzer-Rider conversation as the basis for his argument.

that Rider's statements were received simply to show those things that were said to Mentzer which elicited Mentzer's responses. Respondent argues it is Mentzer's responses which were properly received in evidence as declarations against Mentzer's interest and that the jury clearly understood Rider's role as an undercover operative.

When this objection was raised in the trial court, the court ruled that Rider's statements actually became Mentzer's to the extent that Mentzer's answers adopted what Rider said. The trial court went on to conclude that the express statements made by Mentzer and those in which he endorsed what Rider stated constituted declarations against Mentzer's penal interest.

When viewed in context the statements made by Rider did elicit responses by Mentzer. In our review of the transcript of these conversations it is clear that Mentzer agreed with some things said by Rider and disagreed with others.[15] Further, the statements made by Rider to which Marti assigns error were principally a repetition of matters about which Rider had already testified. For example, Rider testified that Marti told him in 1983 that he had shot first and Mentzer second and that Mentzer had to drink a pint of wine before the "hit" because Mentzer was afraid. During the 1988 tape-recorded conversation, Rider repeated this statement and elicited Mentzer's response, "You know what? Alex was scared shitless of me and he fuckin' better be. . . . Well we drank a little wine before that. Alex even drank a bunch of wine. We drank—we drank a whole bottle. . . . No, you know what? You know Alex is full of shit. I'm the one who set the whole thing up." The trial court concluded that Mentzer's responses were declarations against Mentzer's penal interest.

We agree with respondent that the potential for jury confusion regarding the use to be made of Rider's statements in the 1988 tape was nonexistent. It was clear that Rider's statements could be considered only as efforts to elicit responses from Mentzer. Rider had already been extensively cross-examined about what Marti had told him and he was available for further examination had Marti chosen to recall him. What Rider said on the tape is the functional equivalent of Rider testifying, had he been asked, about what he had said to Mentzer. We find no error in the admission of Rider's statements for the purpose for which they were received.

 Marti next complains that Mentzer's statement, "Alex was scared shitless of me and he fuckin' better be," is not disserving of Mentzer's penal

---

[15]For example:

Rider: "Was Alex funny?"

Mentzer: "Yeah."

Rider: "Started hollering and screaming?"

Mentzer: "Uh-no, not really."

interest. Marti further argues that all portions of Mentzer's statements that referred to him were not specifically disserving of Mentzer's interest and were hearsay and violations of his right of confrontation. He specifically complains that those portions in which Mentzer described what occurred in the car with Radin were not specifically disserving of Mentzer's penal interest.[16]

The trial court ruled otherwise. The court considered Mentzer's entire statement which included the remark: "Alex is full of shit. I'm the one who set the whole goddamn thing up." This was followed by Mentzer's description of the events in the car with Radin, Marti and Lowe. In ruling on Marti's objections the trial court stated that "unlike a lot of the comments in declarations against penal interest cases where someone incriminates a codefendant, here these two particular statements show clearly that Mentzer is a co-conspirator, aider and abettor. At least the first statement clearly shows that he is taking responsibility for this as the one who set it up. And then the other one clearly shows him acting with Mr. Marti and aiding and abetting while Marti is holding the gun on Radin in this thing. . . . What I am saying is that where Mentzer . . . specifically . . . realize[d] that . . . he set the whole thing up . . . that shows the prerequisite component of a declaration against penal interest; that the person realizes it is disserving. That is where the reliability comes from."

Mentzer's references to Marti were an integral part of the statement in which he implicated himself in planning and participating in the kidnapping and murder of Radin. The trial court correctly concluded that Mentzer's statement subjected him to criminal liability to such an extent that a reasonable man in his position would not have made the statements unless he believed them to be true. As discussed *ante*, the trial court also concluded that the totality of the circumstances of the Mentzer-Rider conversation

---

[16]That portion of the transcript contains the following excerpt:
Mentzer: "Ya know what? Man, it was pretty fuckin' funny."
Rider: "Well, how did Alex behave?"
Mentzer: "You know, we were on the floor."
Rider: "What were you doing on the floor?"
Mentzer: "Well, I was - I was on the seat, Alex was on the floor."
Rider: "What was he doing on the floor?"
Mentzer: "Had his gun in his mouth. He says - Alex told him, you know, make one move."
Rider: "Oh, Radin was on the floor too?"
Mentzer: "No, Radin was sitting in the seat. Alex was on the floor with a gun pointed right near Radin's crotch,stuck it right in his crotch."
Rider: "_____"
Mentzer: "I told him, I said, 'Say one word—you're gonna lose everything pal. Pretty funny.' "

provided sufficient indicia of reliability to guarantee the trustworthiness of Mentzer's statement. Applying the abuse of discretion standard of review as we are required to do, we are satisfied that the trial court did not abuse its discretion in arriving at these conclusions and in admitting the portion of the statement which referred to defendant Marti.

### d. *Mentzer-Rider Statements About Lowe*[17]

 Lowe argues that Mentzer's statements about him were not declarations against Mentzer's penal interest and violated his right of confrontation. Respondent argues that the statements were disserving of Mentzer's penal interest in that they implicated Mentzer as the person who planned the killing of Radin and who participated in the kidnapping and murder.[18]

The trial court stated its ruling as follows: "I think in the totality of it if you're talking about the driver and kidnapping, Mr. Mentzer talked about setting the whole thing up, and I think what the driver did is disserving to Mr. Mentzer."

This was part of the same conversation, *ante*, in which Mentzer stated he was the person who set up the "whole goddamn thing" and then described what happened in the car. There does not appear to be any role shifting or effort to minimize his involvement. There was ample evidence to support the trial court's rulings that the portion of Mentzer's statement which referred to Lowe was specifically disserving of Mentzer's penal interest and also that the totality of the circumstances guaranteed its trustworthiness. We find that the trial court did not abuse its discretion in arriving at these conclusions and in admitting the portion of the statement which referred to Lowe.

### 5. *No Violation of Right of Confrontation*

We are satisfied that the trial court conducted the "fact-intensive inquiry" suggested in *Williamson* v. *United States, supra,* 512 U.S. at page 604 [114

---

[17]See attachment 3 which contains those portions of the transcript to which Lowe assigns error. The portions in bold type are the specific statements about which Lowe complains. Lowe's opening brief quotes additional excerpts of conversations between Rider and Mentzer which mention Lowe. However, Lowe's appellate counsel conceded after oral argument that these additional references were not presented to the jury.

[18]The statements in question are:
Rider: "Well, who was driving, who was driving the limousine?"
Mentzer: "Uh—yours truly."
Rider: "You were the limo driver?"
Mentzer: "No, no. That was Bob."
Rider: "And who's in-you and Alex are in the back with Radin"
Mentzer: "Yeah, you know, Bob said his fuckin' heart damn near jumped out of his fuckin' chest."

S.Ct. at page 2437] as to defendants Mentzer, Marti and Lowe. We conclude that the trial court did not abuse its discretion in determining that the statements in question were specifically disserving of the declarants' penal interest and were made in circumstances which provided particularized guarantees of trustworthiness as required by the Sixth Amendment. Admission of these statements, therefore, did not deprive the nondeclarants of their right of confrontation.

### 6. *Denial of Motion to Sever on Aranda-Bruton Grounds*

Lowe and Marti argue that their case should have been severed from Mentzer's, and Mentzer argues his case should have been severed from Lowe's. These defendants cite *Bruton v. United States, supra,* 391 U.S. 123 and *People v. Aranda, supra,* 63 Cal.2d 518. They argue that the denial of their right of confrontation caused by introduction of statements of their codefendants would not have occurred had the trial court granted their pretrial motions to sever. However, we have determined that they were not denied their right of confrontation. Therefore, no error occurred in denial of their motions to sever. (See *U.S. v. Hamilton, supra,* 19 F.3d at pp. 357-358.)

### IV. OTHER SEVERANCE-RELATED ISSUES

#### A. *Background*

Defendants Greenberger, Mentzer and Lowe contend that the trial court committed reversible error by not severing Greenberger's case from the other defendants. Greenberger argues that her defense was antagonistic to the defense of her codefendants and failure to sever resulted in prejudice to her which would not have occurred had there been a severance. The argument of Mentzer and Lowe mirrors Greenberger's in contending that failure to sever their case from Greenberger's resulted in the introduction of evidence during her defense which inculpated them, and this could not have occurred had there been a severance. Defendant Marti contends that the trial court committed reversible error by failing to sever his case from Mentzer's. Greenberger, Marti and Lowe further argue that their defense was unfairly and prejudicially hampered by trial court rulings limiting their introduction of evidence. They argue that this evidence would have been received had their case been severed from Mentzer.

Respondent argues that the trial court did not err in denying severance motions of Greenberger and Lowe, and that Mentzer and Marti did not raise the issue in the trial court and are therefore foreclosed from raising it here. Respondent further argues that if there was error it was harmless.

Section 1098 provides: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials. . . ." In *People* v. *Boyde* (1988) 46 Cal.3d 212, 231-232 [250 Cal.Rptr. 83, 758 P.2d 25] the Supreme Court recognized that this section was the Legislature's expression of preference for joint trials. ██ "The statute nevertheless permits the trial court to order separate trials, and the decision to do so is one 'largely within the discretion of the trial court.' [Citations.] Whether denial of a motion to sever constitutes an abuse of discretion must be decided on the facts as they appear at the time of the hearing on the motion to sever." (*Ibid.*)

"After trial, of course, the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law." (*People* v. *Turner* (1984) 37 Cal.3d 302, 313 [208 Cal.Rptr. 196, 690 P.2d 669].) The appellate court looks "to the evidence actually introduced at trial" in making this latter determination. (*People* v. *Bean* (1988) 46 Cal.3d 919, 940 [251 Cal.Rptr. 467, 760 P.2d 996].) In such an analysis the Supreme Court has stated: "We do not believe that we should reverse a conviction achieved at a joint trial in the absence of a reasonable probability that the defendant would have obtained a more favorable result at a separate trial. Although we recognize the importance of the preservation of the procedural safeguard of a separate trial, the Legislature has decreed joint trials to be the rule and separate trials the exception. . . . We must weigh the prejudicial impact of all of the significant effects that may reasonably be assumed to have stemmed from the erroneous denial of a separate trial." (*People* v. *Massie* (1967) 66 Cal.2d 899, 922-923 [59 Cal.Rptr. 733, 428 P.2d 869].)

Thus there are two levels of review when a defendant alleges prejudicial error in the denial of a motion to sever. The first level of review determines whether the trial court abused its discretion in denying the motion. If it is concluded that there was no abuse of discretion, the next level of review determines whether the failure to sever resulted in gross unfairness which denied the defendant a fair trial or due process. The first level of review focuses on what was presented to the trial court at the time it made its decision. The second level of review focuses on what actually happened in the joint trial.

In *People* v. *Massie, supra,* 66 Cal.2d at pages 922-923 the Supreme Court established guidelines for the trial court's exercise of discretion. The court concluded that the trial court "should separate the trials of codefendants in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting

defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (*Id.* at pp. 916-917, fns. omitted.)

The Supreme Court has characterized a trial in which the defendants are charged with common crimes against common victims as the classic situation for joint trials. (*People* v. *Turner, supra,* 37 Cal.3d at p. 312; *People* v. *Hardy* (1992) 2 Cal.4th 86, 168 [5 Cal.Rptr.2d 796, 825 P.2d 781].) In *Turner* the defendant argued that his defense would conflict with that of the codefendant, allowing the People to sit back and watch the defendants become adversaries. The court observed that ". . . if that point has merit, separate trials would appear to be mandatory in almost every case." (*People* v. *Turner, supra,* 37 Cal.3d at p. 313.) The court in *People* v. *Boyde, supra,* 46 Cal.3d 212, 232 observed: "Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, none has found an abuse of discretion or reversed a conviction on this basis."

The Supreme Court, recognizing that few California cases have discussed what constitutes an "antagonistic defense," referred to federal authority and concluded that the concept is construed very narrowly. (*People* v. *Hardy, supra,* 2 Cal.4th at p. 168.) " '[M]utual antagonism' only exists where the acceptance of one party's defense will preclude the acquittal of the other." (*Ibid.,* quoting *United States* v. *Ziperstein* (7th Cir. 1979) 601 F.2d 281, 285.)

The trial court conducted a pretrial hearing on August 24, 1990, and denied all motions to sever. In so doing the court stated: "I have to rule right now based on what I have before me, not what may take place in the future. . . . I find this is not a case that severance is required because of inconsistent defenses. . . . this isn't a case where there are substantial gaps in the People's evidence. . . . I've read the entire preliminary hearing transcript and I've read the declarations filed *in camera,* and this is not a situation where substantial gaps are going to be supplied by the defense . . . the declarations that I have by the three defendants' counsel indicate a situation where the prosecution isn't going to sit back and just let these defendant's [*sic*] testify. . . . It is not a matter of the People proving elements of the case through the defense. . . ."

As discussed separately as to each defendant, we conclude that the trial court did not abuse its discretion in denying the motions to sever, and that there is no reasonable probability that any of the defendants would have obtained a more favorable result had severance been granted.

## B. *Discussion*

### 1. *Greenberger*

■ In support of her motion to sever Greenberger argued that her defense was irreconcilable at its core with the defense of Mentzer, Marti and Lowe.[19] She argued that her defense consisted of proving that her codefendants kidnapped and murdered Radin and their defense consisted of proving that they had nothing to do with it. As quoted *ante*, the trial court, basing its ruling on the information then available to it, denied her motion as well as the motions of the codefendants.

Greenberger renewed her motion to sever at various times during the trial. Each time the motion was denied.

Greenberger does not contend that the trial court abused its discretion in denying her motion to sever. She contends that "it would be a waste of judicial economy to argue the issue from the pretrial stance."[20] She addresses the second level of review, discussed *ante,* that failure to sever resulted in gross unfairness which denied her a fair trial or due process.

We then turn to Greenberger's arguments that evidence offered by the codefendants was improperly admitted, undermining her defense, and evidence she offered was improperly excluded to protect the codefendants.

Greenberger's defense consisted of evidence offered to prove that she did not have knowledge of the plan to kidnap or kill Radin. She testified that all she knew was that Mentzer, at the direction of Bellachasses, was going to talk to Radin about the thefts. She now argues that the attack on her defense by the codefendants would not have occurred had there been a severance. Specifically she points to Marti's cross-examination of witnesses which was designed to attack her character, such as references to her drug use and drug

---

[19]Greenberger also sought severance on the ground that her codefendants wanted to continue the trial over her objection in order to prepare for trial. She asserted that a continuance of six months would deny her a speedy trial. The trial court denied severance on this ground. She sought relief in Division Seven of this appellate district. The court found that multiple trials would inconvenience witnesses, delay the trial of the codefendants, drain judicial resources, increase prosecution burdens and multiply trial confusion. The court therefore concluded that the preference for joint trials prevailed over Greenberger's speedy trial rights. (*Greenberger* v. *Superior Court* (1990) 219 Cal.App.3d 487 [267 Cal.Rptr. 849].)

[20]Counsel for Greenberger filed under seal in the trial court a declaration in support of her motion to sever. This declaration apparently set forth a detailed account of her anticipated defense. The declaration cannot be located in the record on appeal.

trafficking, spending habits, sex life and parenting skills. A review of the record satisfies us that she suffered no prejudice in this regard. Some of the evidence about which she complains was received without objection. Some evidence was properly received during the People's case-in-chief. Some was properly received in rebuttal to evidence introduced on her behalf. Some was excluded by the trial court upon timely objection of her counsel. Although some questions might not have been asked had there been a severance, we conclude that the questioning did not result in gross unfairness, denial of a fair trial or denial of due process. Much of the evidence she complains of concerned trivial matters with no potential prejudice.

Greenberger also argues that certain evidence was improperly excluded. The only example she provides is the trial court exclusion of her offer of evidence that Mentzer and Bellachasses had a drug-dealing relationship which did not involve her. She contends this evidence would have supported her theory that Mentzer and Bellachasses planned to kill Radin without her participation. However, the record reflects that Greenberger's offer of proof to the trial court was much different. Her counsel argued that Mentzer's admission of dealing cocaine for Bellachasses after Radin's death would show that Lowe had acquired the Cadillac (referred to in Lowe's conversation with Rider) because of Lowe's involvement in cocaine trafficking with Mentzer and Bellachasses rather than as payment to Lowe for his involvement in the Radin murder. Counsel's trial court argument on this issue does not support the argument Greenberger makes here. Based on this record the trial court properly exercised its discretion pursuant to Evidence Code section 352 in concluding that the prejudicial impact greatly outweighed the probative value of this evidence.

We conclude that these evidentiary rulings did not result in any prejudice to Greenberger and did not deprive her of a fair trial or due process.

### 2. Greenberger's Proposed Comment on Mentzer's Decision Not to Testify

■ During discussion of jury instructions counsel for Mentzer and Lowe requested that the trial court order counsel for Marti and Greenberger not to comment on the fact that Mentzer and Lowe did not testify. Counsel for Mentzer argued any such comment would violate his client's Fifth Amendment right to remain silent. The trial court ordered all counsel not to make any reference to the fact that Mentzer and Lowe did not testify. Greenberger and Marti then moved for a severance which was denied.

Greenberger, joined by Marti,[21] argues that the trial court committed prejudicial error by refusing to permit comment on Mentzer's decision not to testify. She argues that Mentzer's failure to testify in the face of overwhelming evidence demonstrated his consciousness of guilt. Relying on *De Luna* v. *United States* (5th Cir. 1962) 308 F.2d 140, as she did in the trial court, Greenberger contends that refusal to permit her to refer in closing argument to Mentzer's decision not to testify benefited Mentzer at her expense and denied her due process.

Respondent argues that the trial court properly ordered counsel not to comment in any way on Mentzer's decision not to testify. Respondent cites established authority which states that comment by an attorney representing one defendant on the silence of a codefendant violates the codefendant's constitutional right to remain silent. (See *People* v. *Hardy*, *supra*, 2 Cal.4th at p. 157; *People* v. *Jones* (1970) 10 Cal.App.3d 237, 243-244 [88 Cal.Rptr. 871]; *U.S.* v. *Castro* (9th Cir. 1989) 887 F.2d 988, 997; *U.S.* v. *Mena* (11th Cir. 1989) 863 F.2d 1522, 1533-1534.)

Greenberger contends, however, that this argument fails to address the impact of the trial court's restriction on her. She argues that the trial court should have either allowed comment or granted a severance. She finds support for this position in dictum in the majority opinion in *De Luna* v. *United States*, *supra*, 308 F.2d at page 141: "If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a codefendant's silence, the trial judge's duty is to order that the defendants be tried separately." (See also *United States* v. *Echeles* (7th Cir. 1965) 352 F.2d 892, 898.)

We are not persuaded by Greenberger's argument. We find that neither Greenberger nor Marti would have benefited from counsel's comment on the codefendants' failure to testify. Further, the prospect of severance whenever a defendant elects to offer such comment would provide an easy but unacceptable mechanism for defeating the statutory preference for joint trials.[22] (See *United States* v. *McClure* (10th Cir. 1984) 734 F.2d 484, 491 ["Great amounts of legal and judicial resources have been spent distinguishing numerous cases from the *DeLuna* dictum. Again, no decision of which

---

[21]In his opening brief Lowe joined in Greenberger's argument. However, since he joined in Mentzer's request that the trial court prohibit comment on the nontestifying defendants' silence, he may not now complain that the trial court ruled in his favor.

[22]The specially concurring opinion in *De Luna* provides an accurate analysis of the situation that would result if the quoted dictum from the *De Luna* majority opinion were to be given effect: "If [the codefendant], or others similarly situated, claims the right which the majority holds that he has to comment on the failure of de Luna to testify, a mistrial will be required at the instance of his co-defendant who did not take the stand. In addition, severance in advance of trial may be required where there is a representation to the court that one

we are aware, including *DeLuna,* has ever ordered a severance on the basis of the *DeLuna* rationale. [¶] We reject the dictum of the *DeLuna* majority and today hold that under no circumstances can it be said that a defendant's attorney is obligated to comment upon a codefendant's failure to testify. . . . [¶] . . . Should a defendant seek to lay blame upon a nontestifying codefendant, he can always take the stand and testify against him. Such testimony would be entitled to great probative value; a jury's decision resting upon this evidence would, in our view, rise to a fairer level than one influenced by self-serving implications drawn by an attorney regarding a codefendant's silence." (Fn. omitted); see also *U.S.* v. *Causey* (6th Cir. 1987) 834 F.2d 1277, 1287.)

We are satisfied that the trial court correctly ruled that no comment would be allowed.

### 3. *Marti*

Defendant Marti contends that failure to sever his case from Mentzer's denied him a fair trial.[23] On appeal Marti primarily addresses the issue of severance from the perspective of *Aranda-Bruton* error and denial of his right of confrontation, which we have rejected *ante.* He also contends that the People would have been required to call Mentzer as a witness in a separate trial instead of presenting Mentzer's declarations against interest. He would then have had the opportunity to cross-examine Mentzer. This argument is based upon the assumption that Mentzer would have been available as a witness in a separate trial.

Respondent contends that Marti never sought severance in the trial court on this specific ground. Respondent correctly argues that *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1049 [5 Cal.Rptr.2d 230, 824 P.2d 1277] forecloses appellate review of a challenge to a trial court's rulings if a defendant did not present the trial court with the argument advanced on appeal. The record supports Marti's position, however, that he did present the trial court with the argument that failure to sever would deny him his right to cross-examine Mentzer. We find this was sufficient to preserve the issue.

However, there is no basis for concluding that Mentzer would have been available as a witness had there been a severance. Had his trial proceeded

---

co-defendant does not expect to take the stand while another or others do expect to testify, and claim their right to comment upon the failure of the other to testify. This would eliminate joint trials, or vest in a defendant the right to a mistrial during final arguments, or in the alternative create built-in reversible error, all in the discretion of the defendants. The law contemplates no such end." (*United States* v. *De Luna, supra,* 308 F.2d at p. 156.)

[23]Although in his pretrial and midtrial motions to sever Marti contended that he would suffer prejudice by joinder with Greenberger, he does not complain in this appeal that the trial court committed error in refusing to sever his case from Greenberger's.

first, and had he been convicted, Mentzer would still have had his Fifth Amendment rights during the trial of the other charges which had been severed as well as throughout the entire appellate process. (See *People* v. *Mendoza* (1992) 8 Cal.App.4th 504, 515 [10 Cal.Rptr.2d 312]; *People* v. *Lopez* (1980) 110 Cal.App.3d 1010, 1021 [168 Cal.Rptr. 378].) Further, it was within the trial court's discretion to determine which trial would proceed first. (*People* v. *Leach, supra,* 41 Cal.3d at p. 102.) There is no reason to believe that Mentzer's trial would have preceded Marti's. Marti has also failed to show that the People would not have been able to introduce Mentzer's declarations against interest in Marti's separate trial had the trial court granted his motion to sever. Thus Marti has failed to show that he suffered prejudice from the trial court's failure to sever on this ground.

### 4. *Evidence Offered by Marti to Impeach Rider*

The balance of Marti's argument relates to his contention that failure to sever his case from Mentzer's resulted in evidentiary rulings which protected Mentzer's rights at Marti's expense by foreclosing Marti's impeachment of Mentzer and Rider. The court conducted a hearing on February 20, 1991, concerning the prosecution's motion to limit cross-examination of witness William Rider. Marti, joined by Mentzer,[24] contends that the trial court committed reversible error at this hearing by rulings it made pursuant to Evidence Code section 352[25] which precluded significant cross-examination of Rider. Marti contends that Rider was the key prosecution witness, and the trial court's rulings prevented him from accurately portraying Rider as Mentzer's accomplice and a person of bad character. Marti further contends the People were permitted to portray Rider falsely to the jury as a former police officer who voluntarily assisted in the Radin murder investigation as a good citizen. Marti contends that these rulings violated his right of confrontation guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution.

The confrontation clause guarantees the defendant in a criminal prosecution the right of cross-examination, which includes exploration of bias. (*Davis* v. *Alaska* (1974) 415 U.S. 308 [94 S.Ct. 1105, 39 L.Ed.2d 347].) "It does not follow, of course, that the Confrontation Clause of the Sixth

---

[24]Although Mentzer has joined in Marti's argument herein, he objected to any reference to the Mincher murder in the trial court. To the extent the trial court agreed with his position he may not now complain that the trial court erred.

[25]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 679 [106 S.Ct. 1431, 1435, 89 L.Ed.2d 674]; see also *People* v. *Harris* (1989) 47 Cal.3d 1047, 1091 [255 Cal.Rptr. 352, 767 P.2d 619].) Exclusion of impeaching evidence on collateral matters which has only slight probative value on the issue of veracity does not infringe on the defendant's right of confrontation. (*People* v. *Jennings* (1991) 53 Cal.3d 334, 372 [279 Cal.Rptr. 780, 807 P.2d 1009].)

■■■ The determination whether a defendant has been denied the right of confrontation is focused on the individual witness. The standard for determining if a confrontation clause violation has occurred is whether a reasonable jury might have received a significantly different impression of the witness's credibility had the defendant been permitted to pursue his proposed line of cross-examination. (*Delaware* v. *Van Arsdall, supra,* 475 U.S. at p. 680 [106 S.Ct. at pp. 1435-1436].) If it is determined that trial court rulings limiting cross-examination of a witness have denied the defendant his right of confrontation, the error is subject to harmless-error analysis. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (*Id.* at p. 684 [106 S.Ct. at p. 1438]; see also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 750-751 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Belmontes* (1989) 45 Cal.3d 744, 780-781 [248 Cal.Rptr. 126, 755 P.2d 310].)

■■■ Certain rulings about which Marti complains related to the murder of June Mincher, a crime with which only Mentzer and Lowe were charged. Those charges had been severed from the charges relating to the death of Radin and were not before the jury.[26] Specifically Marti complains that although evidence was admitted to show that Rider was aware that Mentzer

---

[26]See footnote 2, *ante*, page 315.

had been involved in Radin's murder and Rider thereafter loaned a .22-caliber pistol with silencer to Mentzer, Marti was not permitted to show that the gun was then used to murder June Mincher. Further, although the jury was informed that Rider did not turn the weapon over to authorities until one year after he was contacted by the police regarding Radin's murder, Marti was not allowed to prove that Rider failed to disclose to the police that he believed his gun had been used to kill Mincher.

Marti argues that the excluded evidence would have been helpful in establishing his theory that Rider was an accomplice in both the Radin and Mincher murders. He contends this theory was supported by evidence that Rider's gun could not be eliminated by firearms examiners as the weapon that killed Radin. He argues that, had Rider been viewed by the jury as an accomplice, Rider's testimony would have required corroboration, and the only corroboration connecting him to the murder of Radin was the questionable testimony of Estanislau Kreutzer. The trial court concluded that the proffered evidence was cumulative, and its admission would not have created a significantly different impression of Rider's credibility, although it did have the potential of prejudice to Mentzer.[27] Marti contends that this was an improper use of Evidence Code section 352.

The application of Evidence Code section 352 is not limited to a conflict between opposing sides but may also apply to parties on the same side of litigation when they have adverse positions relative to the introduction of evidence. (*People* v. *Ainsworth* (1989) 45 Cal.3d 984, 1007, at fn. 10 [248 Cal.Rptr. 568, 755 P.2d 1017].) The rule is the same whether the party objecting to introduction of evidence is the prosecution or a codefendant. However, in a joint criminal trial, if admission of evidence of significant probative value to one defendant would be substantially prejudicial to a codefendant the remedy is not exclusion of the evidence but rather a limiting

[27]The trial court stated: " I think what is relevant is, is what you pointed out, the one point, that his state of mind in giving this gun to somebody he thought committed a murder really undercuts the whole testimony we've already got in front of the jury, that Mr. Mentzer made this admission or confession to him . . . if you bring out that he didn't turn it in once he knew about the fact that it had been used in a homicide, then the clear inference will be Mr. Mentzer committed the homicide. There the prejudice is so substantial compared to any probative value it seems to me that I am not going to allow you to get into it. . . . This is not a witness that is taking a position on the stand that he came forward as soon as he knew anybody wanted him. He has already testified on direct that he was contacted. That he pussyfooted around and delayed, he didn't really do anything of substantial cooperation for some period of time beyond just coming out here looking at the location. I don't think this jury has the picture of Mr. Rider as somebody rushing to cooperate with the police. So, you know, one more thing such as this, that he didn't turn over a piece of physical evidence that might have some evidentiary value to them doesn't seem to me to deprive the jury of a substantial basis to judge Mr. Rider's credibility even in that respect. I don't think it changes the picture much."

instruction or severance. (*People* v. *Reeder* (1978) 82 Cal.App.3d 543, 553 [147 Cal.Rptr. 275].) In such a situation "Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of significant probative value to his defense. . . . [¶] We do not mean to imply, however, that a defendant has a constitutional right to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using Evidence Code section 352." (*Ibid.*)

Cross-examination is subject to restriction under Evidence Code section 352 if it is cumulative or if it constitutes impeachment on collateral issues. (*People* v. *Mincey* (1992) 2 Cal.4th 408, 440 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People* v. *Sanders* (1995) 11 Cal.4th 475, 514, fn. 6 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1221 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Morse* (1992) 2 Cal.App.4th 620, 641-642 [3 Cal.Rptr.2d 343]; see also *Delaware* v. *Van Arsdall, supra,* 475 U.S. at p. 679 [106 S.Ct. at p. 1435].)

 Review of a trial court decision pursuant to Evidence Code section 352 is subject to abuse of discretion analysis. (*People* v. *Clair* (1992) 2 Cal.4th 629, 654-655 [7 Cal.Rptr.2d 564, 828 P.2d 705]; *People* v. *Stewart* (1985) 171 Cal.App.3d 59, 65 [215 Cal.Rptr. 716].) "The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon mechanically automatic rules. . . . Moreover, the trial court's ruling under section 352 will be upset only if there is a clear showing of an abuse of discretion." (*People* v. *Stewart, supra,* 171 Cal.App.3d at p. 65, citations omitted.)

 The trial court herein correctly concluded that reference to the Mincher murder was not significant to Marti's defense but was highly prejudicial to Mentzer and also cumulative. The relevant facts here were that Rider loaned a pistol with a silencer to Mentzer after he came to believe that Mentzer had killed Radin, and that Rider did not make any disclosures to the police of what he knew about Radin's death until a year after he had been contacted by the police. What Mentzer did with the pistol had no relevance to Marti's defense and was therefore properly excluded. Exclusion of reference to the Mincher murder did not inhibit Marti's defense in any way. We are satisfied the trial court did not abuse its discretion in thus limiting cross-examination of Rider pursuant to Evidence Code section 352.

Marti also argues that he was prevented from questioning Rider about his involvement in two murder conspiracies, a plot to blow up a capitol building and the death of a person named General Worbel, which he contends would

have constituted substantial impeachment of Rider's character. Marti argued to the trial court that these matters tended to impeach Rider's credibility and would show, even if the allegations were not true, that Rider bragged about criminal deeds to such an extent that Marti was motivated to respond in kind by bragging about crimes he did not commit, including the murder of Radin. The People objected that this evidence was not relevant, and if it had any relevance the probative value was substantially outweighed by potential prejudice pursuant to Evidence Code section 352. The trial court sustained the objections. We find no abuse of discretion.

Information presented to the trial court relating to these allegations was sketchy at best. There was no evidentiary support for these allegations other than a representation that counsel wanted to ask Rider about them.[28]

The trial court found that there was insufficient evidence at the time of the hearing to justify cross-examination on these matters. There was nothing in the record to suggest that Marti had been motivated by either fear of Rider or a desire to impress Rider with false accounts of criminal deeds. The trial court correctly concluded that the probative value of this evidence was substantially outweighed by its potential prejudice. "Although we recognize that a criminal defendant has a constitutional right to present all relevant evidence of a *significant* probative value in his favor [citations] '[t]his does not mean that an unlimited inquiry may be made into collateral matters; the proffered evidence must have more than "slight-relevancy" to the issues presented.'" (*People* v. *Jennings, supra,* 53 Cal.3d at p. 372, quoting *People* v. *Northrop* (1982) 132 Cal.App.3d 1027, 1042 [182 Cal.Rptr. 197]; see also *People* v. *Sully, supra,* 53 Cal.3d 1195, 1220-1221.

 Rider was subjected to extensive cross-examination which was often contentious, and which resulted in an abundance of impeaching evidence. This evidence established that Rider was in dire financial straits at the time he agreed to cooperate with the police investigation and thereafter was paid $3,000 per month, and he had been paid over $80,000 by the prosecution by the time of his testimony. It was brought out that he received a concealed weapons permit from the sheriff's department after his cooperation, and that he had a paranoid fear of his former employer Larry Flynt,

---

[28]Counsel represented to the court that the allegation relating to Worbel was based upon a dying declaration from Worbel obtained by Marti which implied that Rider had poisoned Worbel and that Rider had admitted doing so to Marti. The trial court ruled that Marti, during his cross-examination of Rider, would be bound by Rider's answers about whether he had admitted the crime to Marti.

The trial court stated that all of its rulings on these matters could be reconsidered during the defense case. We have been referred to nothing in the record, however, indicating that the defense sought such reconsideration.

which manifested itself in sleeplessness, weight loss, sexual dysfunction and crying spells. It was disclosed that Rider had been undergoing hypnotherapy. Rider was impeached with prior inconsistent statements on numerous occasions, including admissions of having previously lied under oath. His bias was clearly exhibited during cross-examination.

Further, it was disclosed during his examination that Rider remained friendly with Mentzer and Marti even after he concluded that they had been involved in Radin's murder, and that he rehired Marti to work for Flynt. Rider testified he owned a .22-caliber pistol with silencer which he believed to be illegal and that he loaned the gun to Mentzer after he believed that Mentzer had been involved in Radin's murder. It was also made clear that Rider did not turn the gun over to the police until 1988. Also Rider testified he did not disclose to the police any information he had about Radin's murder until 1988 although he had such information in 1983.

Even if the trial court had abused its discretion in limiting cross-examination of Rider, we are satisfied that a reasonable jury would not have received a significantly different impression of Rider's credibility had Marti been permitted to pursue his proposed line of cross-examination. We find no denial of Marti's right of confrontation. "As we have stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not to a perfect one." (*Delaware* v. *Van Ardall, supra,* 475 U.S. at pp. 680-681 [106 S.Ct. at p. 1436]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 750, at fn. 2.)

### 5. *Marti's Mistrial Motion*

Marti contends that the trial court committed reversible error in not granting his motion for mistrial made during the prosecutor's redirect examination of witness William Rider. The basis of this motion was an answer given by Rider to a question asked by the prosecutor.[29] Marti contends that the defense was "sandbagged" by the prosecutor who engaged in a deliberate

---

[29]On redirect examination the following sequence occurred:

"Q: [By Mr. Conn, the prosecutor]: You were shown a .22 pistol which you indicated is the gun that was given to Mr. Mentzer. Did you ever see Mr. Mentzer with guns similar to that?

"A: Yes, I did.

"Q: When was that?

"A: I believe it was in 1982 when he sold me that pistol.

"Q: How many guns did you see at that time?

"A: He had two others just like that.

"Q: And did you know what he did with those guns?

"A: He gave one to Mr. Marti and he kept one.

"[Counsel for Mentzer]: Objection, move to strike.

strategy to derail the defense effort to impeach Rider. He contends that the prosecutor had a duty to disclose new information which he learned during an interview with Rider and to seek a ruling from the court as to whether the information was admissible before asking the question. Marti argues that the answer given by Rider introduced evidence which violated his right of confrontation and was a by-product of the trial court's decision to try the defendants jointly. Marti argues that the resulting prejudice was so great that the only remedy was mistrial. Mentzer joins in this argument.

Marti's counsel cross-examined Rider about the .22-caliber pistol with silencer which Rider loaned to Mentzer after Rider became aware that Mentzer had been involved in the murder of Radin. It was brought out that this weapon had originally been Mentzer's and had been sold to Rider. Marti's counsel even marked the weapon as an exhibit. Marti argues that his purpose in conducting this examination was to infer that this weapon may have been the weapon that killed Radin and to show that Rider may have been an accomplice in the Radin murder. Marti also contends that this examination would have impeached the prosecution theory that two .22-caliber pistols had been used to kill Radin and would have impeached Plzak's testimony that he was with Marti when Marti disposed of two .22-caliber pistols used in the Radin murder. Marti contends that he would never have engaged in this strategy of cross-examination had he known what the prosecutor was going to bring out during redirect.

Marti's counsel then argued for a mistrial on the ground that the prosecutor deliberately introduced highly prejudicial evidence without prior notification to the court and the defense. The prosecutor stated that he learned the preceding day about Mentzer giving one gun to Marti, and he did not know whether this had been mentioned in reports which had been previously furnished to the defense in discovery.

The court then conducted a hearing without the jury present. Rider was questioned concerning the source of his information about what Mentzer did with the other .22-caliber pistols. He testified that Mentzer told him that Marti had also bought one pistol but it hadn't been delivered yet. Rider further testified he told the prosecutor about this the preceding day but told the investigators about it two years earlier. Sergeant Stoner then testified that he had a conversation with Rider, which he believed occurred when Rider gave him the .22-caliber in 1988, and Rider told him that Mentzer had two other guns similar to the one he sold to Rider. Mentzer also told Stoner that

---

"[Counsel for Marti]: Objection, calls for speculation and foundation.
"The Court: Lack of foundation, Mr. Conn. Sustained, stricken.
"[Counsel for Marti]: Ask to approach to side bar, your honor."

Marti got one of the guns. But Rider stated that he was not present when Marti obtained the gun. Stoner acknowledged that his report stated only: "Mr. Rider stated Mentzer purchased three .22 pistols with silencers possibly from the Ace gun dealership." The prosecutor stated to the court: "If I had recognized that that was never before mentioned, that this was therefore a new statement and I had seen it in that light, I would have reduced it to writing. I did not see it in that light."

After further argument the trial court excused the jury and recessed the trial to give all counsel an opportunity to prepare written argument on the admissibility of Rider's testimony and, if it was not admissible, whether a mistrial should be declared. Each defendant agreed to this delay. The trial court stated that it was concerned about the issue of prejudice to the defendants rather than whether a discovery violation had occurred. The court reconvened one week later and heard argument. The trial court agreed with Marti that the statement was inadmissible hearsay. The trial court then denied Marti's mistrial motion, concluding that any harm suffered by Marti would be remedied by the following instruction to the jury:

"Ladies and gentlemen, before you were excused last Thursday there was testimony by Mr. Rider concerning the other two .22's, and Mr. Mentzer gave one to Mr. Marti and he kept one. I have sustained an objection to this testimony and struck the testimony and told you to disregard it. It's clear that this testimony was not based on personal knowledge of Mr. Rider.

"Furthermore, it's clear that the testimony was based on pure assumption and rank speculation. I, therefore, repeat and emphasize my earlier instruction to you that you're to disregard the statement.

"Furthermore, last Thursday you heard other testimony by Mr. Rider concerning the other two .22's. I am now striking all such testimony. That testimony in its entirety is irrelevant to these proceedings and potentially very confusing for you. This testimony about the other two .22's would have had the tendency of causing a great deal of unfounded speculation by this jury.

"After further proceedings it is abundantly clear that these weapons have nothing to do with Mr. Radin's death. The prosecution admits and concedes that these weapons are not the murder weapons. That they have nothing to do with the killing in this case. Therefore, the testimony is irrelevant, and is stricken and you are to completely disregard it."

Marti argues that the instruction was inadequate and the only proper remedy was a mistrial. Much of this argument is based upon the supposition

that the trial court concluded that the prosecutor had engaged in a deliberate scheme to withhold evidence and introduce inadmissible hearsay. However, the trial court made no such findings. Therefore, Marti's argument in that regard is not supported by the record. Marti also argues that the prejudice resulting from the introduction of this inadmissible hearsay could only be remedied by a mistrial. Marti argues that this evidence substantially undermined his cross-examination of Rider. Viewed from the perspective of the entire record, however, Marti's assessment of damage is grossly overstated. The trial court initially struck the answer and then gave the instruction quoted *ante*. Marti, citing *United States* v. *Bruton*, *supra*, 391 U.S. 123, argues that the answer given by Rider denied him his right of confrontation because it introduced evidence of a statement of a codefendant. Marti is mistaken. The complained of testimony made no mention of anything said by Mentzer. The statement was appropriately treated as inadmissible speculation. As such we find no denial of Marti's right of confrontation.

We conclude that the instruction given by the trial court adequately dealt with whatever prejudice resulted from Rider's answer.[30]

### 6. *Mentzer*

 Defendant Mentzer contends that he joined in the pretrial motions of his codefendants to sever based on the argument that Greenberger's defense was in conflict with the defense of the other defendants. He argues that the trial court's denial of his motion constituted prejudicial error. Respondent contends that Mentzer never raised this issue in the trial court and is precluded from doing so here. Mentzer further argues that the trial court erred in denying his request to sever at the close of the People's case-in-chief. He contends that the trial court should have permitted him to argue his case to the jury and have his case decided by the jury before the other defendants, especially Greenberger, presented their defense.

The trial court heard oral argument and decided the issue of severance on August 24, 1990. Written motions to sever had been filed by Greenberger,

---

[30]After the court completed this instruction, counsel for Marti asked to approach the bench and requested that the court give the following which he represented was based upon *People* v. *Bolton* (1979) 23 Cal.3d 208, 216, fn. 5 [152 Cal.Rptr. 141, 589 P.2d 396]: " 'Ladies and Gentlemen of the jury, the prosecutor has just made certain uncalled for insinuations about the defendant. I want you to know that the prosecutor has absolutely no evidence to present to you to back up these insinuations. The prosecutor's improper remarks amount to an attempt to prejudice you against the defendant. Were you to believe these unwarranted insinuations, and convict the defendant on the basis of them, I would have to declare a mistrial. Therefore, you must disregard these improper, unsupported remarks.' "

We agree with the trial court's assessment that what Marti requested was already covered in the instruction given by the court.

Marti and Lowe. After counsel for Greenberger argued in support of her motion to sever on the ground of conflicting defenses, counsel for Mentzer stated: "I did not join in that motion, Your Honor." After further argument by counsel for Marti, the following discussion occurred:

"[Trial counsel for Mentzer]: Excuse me, Your Honor. Having listened to counsel—

"The Court: You are persuaded?

"[Trial counsel for Mentzer]: I have been persuaded that I should join in the motion in a request for a severance. And I would point out one other factor that I think is important—

"The Court: Of course, I have nothing before me as to Mr. Mentzer's defense, although I can guess—it would be a guess.

"[Trial counsel for Mentzer]: Except that it was stated and I don't think you need to guess because I think it was stated in black and white.

"The Court: Mr. Shohat [Counsel for Greenberger] doesn't necessarily speak for you, as he just told me.

"[Trial counsel for Mentzer]: That is true.

"The Court: In fact, he may be swinging at you.

"[Trial counsel for Mentzer]: I will be sure to duck at the appropriate time. I would ask court to make—

"The Court: Who are you aligning yourself with? Which camp, just so it is clear on the record?

"[Trial counsel for Mentzer]: I'm certainly not aligned with the Greenberger camp.

"The Court: Okay. So you are aligned with the Marti/Lowe camp?

"[Trial counsel for Mentzer]: There seems to be at least a division. I think there is one other thing to consider, your honor, someone brought up . . . the necessity for us to look down the road and come to the conclusion that we may be looking at a penalty phase as to all four of these defendants. And if that is true. . . ."

Counsel for Mentzer then proceeded to discuss the potential penalty phase problems of a joint trial. He never returned to any discussion of severance

based on conflicting defenses. Mentzer never set forth how his defense conflicted with Greenberger's. As was correctly observed, counsel for Greenberger did not speak for Mentzer. The trial court was left to speculate about what motion Mentzer was joining. If he was joining in the motion of Lowe or Marti, Mentzer failed to set forth what his defense would be so that the trial court could evaluate whether there were sufficient grounds for severance. Mentzer has failed to preserve this issue for appellate review. (See *People* v. *Champion* (1995) 9 Cal.4th 879, 906 [39 Cal.Rptr.2d 547, 891 P.2d 93]; *People* v. *Mitcham, supra,* 1 Cal.4th at p. 1048.) Further, even if we were to conclude that he had preserved this issue, he presented such minimal support for his position in the trial court that it is clear that the court did not abuse its discretion in refusing to sever his case prior to trial.

On March 25, 1991, at the conclusion of the People's case-in-chief, Mentzer requested that he be permitted to argue his case to the jury before the other defendants presented their defense. He further requested that the trial court instruct the jury pursuant to CALJIC Nos. 2.60 and 2.61. When his requests were denied he made a motion for mistrial and for severance. He argued: "It just seems that the court is forcing us to face a second prosecutor in this case. And the court has had an opportunity to hear the evidence. There is a lot of evidence in this case, but, boy, none of it is exactly pure as the driven snow. It's tainted with prejudice, inconsistency, multiple impeachments." The trial court denied this motion.

Mentzer renewed his motion on April 10, 1991, after Marti and Lowe rested. Lowe and Marti joined in his motion to have the jury decide each of their cases before the jury heard evidence from Greenberger. In the alternative each requested the court to instruct the jury that evidence introduced during Greenberger's defense was to be limited to her case. In denying the motions the trial court observed that it found no authority and none had been cited which sanctioned such a bifurcated procedure or limiting instruction requested by the defendants.

Defendants Mentzer, Marti and Lowe renewed their motions on April 26, 1991, after Greenberger completed her direct examination. During the April 26 hearing, after the jury heard the direct examination of Greenberger, counsel argued the prejudicial impact of Greenberger's testimony on the codefendants. Greenberger also renewed her motion for severance on the grounds that the codefendants would be attacking her credibility during cross-examination. In denying the motions the court stated: "Mr. Conn [the deputy district attorney] is right, there was a strong case. There aren't any big factual gaps that the People were missing or weak on one element of their case. What you point to are really credibility things. . . . Certainly,

what you've raised is cumulative of evidence already presented by the People from many different types of witnesses."

Mentzer cites no authority for his argument that he should have been permitted to argue his case and have his case decided by the jury before the codefendants presented their defense. There is good reason why he has not. Such a procedure has apparently never been used in this state. (See *People* v. *Fletcher, supra,* 13 Cal.4th at p. 468, fn. 5.) The procedure, referred to as a "bifurcated trial," has been attempted occasionally in federal court, where it appears to be generally disapproved. "We note, however, that federal appellate courts have reversed convictions of defendants whose guilt has been determined in a bifurcated trial, concluding that it may be practically impossible for a jury to determine one defendant's guilt without impermissibly prejudging the guilt of another defendant jointly tried." (*Ibid.*; see also *U.S.* v. *Goland* (9th Cir. 1990) 897 F.2d 405, 411.) We conclude that the trial court did not abuse its discretion in denying Mentzer's motion to have a bifurcated trial.

We are satisfied that the trial court's refusal to grant Mentzer's motions did not result in gross unfairness which denied him a fair trial or due process. (*People* v. *Turner, supra,* 37 Cal.3d at p. 312.) We agree with the trial court's assessment that whatever evidence was presented during Greenberger's defense was merely cumulative of the strong case presented by the People in their case-in-chief. This was not a situation in which the People relied upon the defendants to bolster a weak prosecution case.

### 7. *Limitation on Mentzer's Cross-examination of Greenberger*

Defendant Greenberger moved to Florida after Radin's murder and married Larry Greenberger, who subsequently died under suspicious circumstances at their home in Florida. At the conclusion of Greenberger's direct examination her attorney requested that the trial court limit cross-examination. One subject of this motion was the death of Larry Greenberger. Mentzer's trial counsel argued that he should be allowed to question on this subject since Greenberger had solicited Mentzer to kill her husband and, at his funeral, admitted to Mentzer that she was responsible for his death. Mentzer argued that this evidence would impeach Greenberger's credibility by demonstrating her participation in a crime of moral turpitude. He also argued that cross-examination on this subject would show Greenberger's bias and motive to lie because of her interest to see that Mentzer was convicted of Radin's murder so that he could not be a witness against her in any prosecution relating to the death of Larry Greenberger.

The court conducted a hearing on May 9, 1991, in which Greenberger testified that she did not ask Mentzer to kill her husband, and she did not tell

Mentzer that she had killed her husband. The trial court then stated it would permit the cross-examination on this subject by Mentzer if Mentzer were to first testify about Greenberger's statement to him. The court observed that questioning of Greenberger on this subject without the evidence to support the allegations would be "absolutely catastrophic." The trial court proposed a temporary pause in the cross-examination of Greenberger until Mentzer presented this evidence to the jury. Mentzer's counsel sought assurance from the trial court that the scope of Mentzer's cross-examination would be limited to the statements Greenberger made to him about Larry Greenberger's death. The trial court stated that it could not specifically define the scope of Mentzer's cross-examination. The court stated: "When you get down to the topic of what is in the scope of direct examination it's not what someone directly said, but what is necessarily implied from their direct. . . . If he is going to testify, have him testify in front of the jury and I will make the rulings as the questions come." Mentzer refused to present his evidence before the jury and the trial court ruled that the questions could not be asked of Greenberger. The court based its ruling on Evidence Code section 352 and concluded that the probative value of the proposed questions without supporting evidence from Mentzer was substantially outweighed by prejudice to Greenberger.

Mentzer complains that the trial court's ruling deprived him of his right of confrontation guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and his right to present relevant evidence in his defense guaranteed by article I, section 28, subdivision (d) of the California Constitution. He argues that the California Supreme Court in *People* v. *Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938] clearly stated that evidence of criminal acts involving moral turpitude, even conduct only amounting to a misdemeanor, is admissible to impeach a witness's credibility.

Clearly, the crimes of murder and solicitation to commit murder are crimes of moral turpitude. However, no foundation was presented by Mentzer to justify asking the questions he proposed. The trial court correctly concluded that the potential prejudice to Greenberger which would result from allowing the questions substantially outweighed the probative value of such questioning since Greenberger denied making the statements and Mentzer did not prove that she did.

As discussed *ante*, a defendant in a criminal trial is guaranteed the right of cross-examination by the confrontation clause of the Sixth Amendment. However, the trial court retains wide latitude to impose reasonable limits on cross-examination. (*Delaware* v. *Van Arsdall, supra*, 475 U.S. at p. 679 [106

S.Ct. at p. 1435]; *People* v. *Harris, supra,* 47 Cal.3d at pp. 1090-1091.) The right of a defendant to present relevant evidence is also subject to reasonable limitation pursuant to Evidence Code section 352. (*People* v. *Sully, supra,* 53 Cal.3d at pp. 1219-1020.) Further, the trial court has discretion to regulate the order of proof. (Evid. Code, § 320.)

The situation in the case at bench is closely analogous to that in *People* v. *Sanders, supra,* 11 Cal.4th at pages 512-514 wherein the trial court precluded defense cross-examination of prosecution witness Rogoway about allegations that Rogoway had collaborated with Richard Quine to accuse the defendant falsely. The trial court therein ruled that the defendant must first call Quine to testify about this collaboration. The Supreme Court concluded that the trial court properly exercised its discretion to require the defendant to establish the foundation for this impeaching evidence before questioning Rogoway. The court stated: "Evidence Code section 403, subdivision (a)(4) provides: '(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when . . . (4) [t]he proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself.' In light of the undisputed background information provided to the court concerning Quine's questionable reliability and limited contact with Rogoway, the trial court properly required defendant to carry the burden of producing evidence as to the existence of the preliminary fact that Rogoway had indeed collaborated with Quine before permitting cross-examination on that point." (*Id.* at p. 514; see also *People* v. *Farmer* (1989) 47 Cal.3d 888, 908-910 [254 Cal.Rptr. 508, 765 P.2d 940].)

Based upon the record herein, the trial court did not abuse its discretion in excluding the inquiry about the death of Larry Greenberger pursuant to Evidence Code section 352.

### 8. *Lowe*

■ Lowe filed a written motion to sever. His motion was argued and decided on August 24, 1990, at the same time motions by the other defendants were considered. Lowe argued that Greenberger's defense would establish that he was the limousine driver during Radin's kidnapping, and this would conflict with his alibi defense. His motion was supported by his counsel's declaration which stated counsel anticipated presenting an alibi

defense. The trial court denied his motion.[31] Lowe, citing *People* v. *Bean*, *supra*, 46 Cal.3d at page 940, argues that an assessment of what actually occurred during the trial establishes that failure to sever due to antagonistic defenses resulted in gross unfairness.

Lowe and Greenberger, however, did not have antagonistic defenses. Greenberger's defense consisted of her effort to prove that she did not know of the plan to kidnap or murder Radin. Lowe's defense was alibi. Greenberger's defense, to be successful, did not require the jury to believe Lowe drove the limousine or was otherwise involved in the crimes. Lowe's defense did not require the jury to believe Greenberger was involved in the planning of Radin's death. Therefore, in the narrow definition of the term, the defenses were not mutually antagonistic. (*People* v. *Hardy*, *supra*, 2 Cal.4th at p. 168.)

However, even if the defenses can be characterized as totally antagonistic, Lowe's joinder with Greenberger did not result in gross unfairness. In *People* v. *Turner*, defendants Turner and Souza were tried jointly for burglary and murder, and Souza testified in his defense that he was forced to assist Turner in the burglary because of his fear of Turner. Turner presented no defense. The Supreme Court found that the trial court did not abuse its discretion in joining the defendants for trial, and further found that joinder did not result in gross unfairness. The court stated ". . . no denial of a fair trial results from the mere fact that two defendants who are jointly tried have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution." (*People* v. *Turner*, *supra*, 37 Cal.3d at p. 313; see also *People* v. *Wallace* (1992) 9 Cal.App.4th 1515, 1520, fn. 4 [12 Cal.Rptr.2d 230] ["while joint trial of defendants who each accuse the other does pose problems, the complaint is that too much rather than too little truth might emerge in the process. While joint defendants might prefer otherwise, this dilemma may serve the public interest in accurate ascertainment of guilt or innocence, . . ."].)

Lowe contends that Greenberger's testimony filled in significant gaps in the People's case. We disagree. The most damning evidence against Lowe came from his taped admissions to Rider and the testimony of Plzak and Korban. Greenberger's testimony that Lowe was in the limousine was

---

[31]As discussed in the preceding section related to Mentzer, after Lowe presented his alibi defense, he joined in Mentzer's motion to have his case decided by the jury before Greenberger presented her defense. He also requested a limiting instruction. He renewed this request after Greenberger completed her direct examination. Our analysis of Mentzer's requests in this regard is equally applicable to Lowe. The likelihood of the jury prejudging guilt of the remaining defendant made such a procedure inappropriate. (See *People* v. *Fletcher*, *supra*, 13 Cal.4th 451, 468, fn. 5.)

merely corroborative of the People's evidence. Lowe argues that the People did not present any evidence that Lowe went to Greenberger's house with Mentzer the day after she discovered the theft of cocaine and money. Even though Greenberger testified about this incident during her defense, we are not persuaded that it is significant. Lowe also complains that Greenberger testified she was instructed to inform him when Jonathan Lawson, Radin's personal assistant, left the hotel. Since Korban and Plzak both testified that Lowe was present during the meeting in which the plans relating to kidnapping Lawson were discussed, Greenberger's testimony in this regard caused Lowe no prejudice. We find that there is no reasonable probability that Lowe would have obtained a more favorable result at a separate trial.

V.-XI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

XII. Issues Relating to Jury Instructions

The defendants contend that the trial court made numerous errors relating to jury instructions. Regarding the charge of aggravated kidnapping of Radin they contend the trial court erred by failing to define the word "reward." They argue that the trial court erred by failing to instruct properly on lesser offenses to both the charge of murder and the charge of aggravated kidnapping. Lowe, Mentzer, and Marti also argue that the trial court erred in instructions relating to the victim's consent to asportation on the kidnapping charge. We will first address the arguments relating to the charge of kidnapping.

A. <em>Aggravated Kidnapping and "Reward"</em>

1. <em>Background</em>

The defendants argue that the trial court committed prejudicial error in failing to define the word "reward" in its instructions relating to the crime of aggravated kidnapping.[51] During discussion of jury instructions prior to argument, the prosecutor proposed instructions containing definitions of

---

*See footnote, <em>ante</em>, page 298.

[51]Former section 209, subdivision (a) provided in pertinent part: "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall be punished by imprisonment in the state prison for life without possibility of parole in cases in which any person subjected to any such act suffers

various words used in the instruction (CALJIC No. 9.53) on aggravated kidnapping. The prosecutor indicated he had relied upon standard dictionary definitions in preparing his instructions. The defendants objected to use of dictionary definitions and, except for requesting the statutory definition of extortion, they opposed the prosecutor's request for additional definitions.

During opening argument the prosecutor argued that the evidence had established that Greenberger was either a principal in Radin's kidnapping or an aider and abettor. The prosecutor argued that as a principal Greenberger acted with "the purpose of extortion or to exact the money and drugs from him." In arguing that Greenberger was an aider and abettor the prosecutor stated the following: "[Greenberger] assisted . . . in getting Mr. Radin into a position where they could kidnap him. . . . And clearly the purpose that Mr. Mentzer, Mr. Marti and Mr. Lowe had in mind was a reward. They got paid for it. That is what a reward is. A reward is merely compensation given in return for some action or service. So, clearly under that theory the defendant Greenberger is an aider and abettor and an actual perpetrator. You understand she's also an aider and abettor for a kidnap for reward because even if she's not paid—which she wasn't—if she does the paying, she has aided and abetted a killing for payment." There was no objection to this argument by defendants.

Greenberger's counsel responded in closing argument: "The prosecution made some comment about well, the reward in this case could be the money, the kidnappers were going to be paid. That's really not quite true. A reward has to be something over and above a payment."

Before his closing argument the prosecutor again requested that the court define "reward" in its instructions. The prosecutor stated he intended to reiterate the definition set forth in the People's opening argument. Lowe's counsel indicated he disagreed with the prosecution's definition. The court stated, "It's a fairly common word and I don't think the jury is going to have a problem with it, notwithstanding conflicting arguments. . . ." and then requested that each side brief the issue, indicating that the issue would be considered later. No briefs were filed, and the matter was not discussed further. The prosecutor then stated in closing argument: "Ladies and gentlemen, you will not . . . receive an instruction which is going to tell you that a reward has to be something over and above a payment as [Greenberger's counsel] said to you. That is simply not the case. We all know what reward means. It's a common usage. Reward you know to be something of benefit.

death or bodily harm, or is intentionally confined in a manner which exposes such person to a substantial likelihood of death, or shall be punished by imprisonment in the state prison for life with the possibility of parole in cases where no such person suffers death or bodily harm."

That's what it is. You know on May 13th Mr. Mentzer wasn't working. He was earning money. That's what he was doing. So, if he kidnapped Mr. Radin with the intent to hold him and detain him he did it for reward. He did it for his own personal benefit." Again the defendants made no objection to this argument.[52]

Greenberger argues that the prosecutor's definition of "reward" impermissibly expanded the scope of the crime of aggravated kidnapping by permitting conviction when one person hires another to commit a kidnapping. She argues that the use of the word "reward" was intended for situations in which "the perpetrators intended to wait until the distressed family [of the victim] posted a reward, and then have some shill return the victim and collect the reward." Greenberger, relying upon dictionary definitions and her review of the legislative history of section 209, contends that a reward requires both a public offer of money for the safe return of the kidnapped person and the kidnapper's intent to obtain money or other valuables from those acting on the victim's behalf. Greenberger argues that the trial court committed reversible error by not providing a definition of "reward" in its instructions to the jury. Lowe, relying upon dictionary definitions and his review of the legislative history of section 209, contends that "reward" means financial gain, and he argues that the jury should have been so instructed: "A 'reward' in this context means something of a material or pecuniary value which the

---

[52]In its instructions to the jury the trial court included the following:
"CALJIC No. 9.53 (mod.)

"The defendants are accused in count 2 of the information of having violated Section 209(a) of the Penal Code, a crime.

"Every person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away, holds or detains any individual by any means whatsoever with the specific intent to hold or detain such individual for reward, or to commit extortion, or to exact from another any money or valuable thing, is guilty of a violation of Section 209 of the Penal Code, a crime.

"It is not essential that the person be carried or otherwise moved for any distance, or at all.

"In order to prove such crime, each of the following elements must be proved:

"1. A person was seized, confined, inveigled, enticed, decoyed, abducted, concealed, kidnapped, carried away, held or detained, and

"2. This act was done with the specific intent to hold or detain such person for reward, or to commit extortion or to exact from another person any money or valuable thing.

"Extortion is defined as the obtaining of money or property from another person with the consent of that person, which consent has been induced by a wrongful use of force or fear.

"If you should find the defendant guilty of the charge against him or her under count 2, you must also find whether the victim suffered death in connection with or as a result of the violation of Penal Code section 209(a) and state your decision in that respect in your verdict."
"CALJIC No. 9.55 (mod.)

"Where a person is charged with the crime of kidnapping for the purpose of reward, extortion or to exact from another person money or some valuable thing, it is not necessary to establish that such purpose was accomplished. The crime is complete if a person is seized, confined, inveigled, enticed, decoyed, abducted, concealed, kidnapped, or carried away, held or detained for that purpose."

defendant had a prior expectation of receiving."[53] Lowe argues that by failing to define "reward" in this manner the trial court permitted the jury to convict if it concluded the kidnapper was motivated by the prospect of nonfinancial benefits, such as "merely to obtain stature or approval in the eyes of his peers or to derive some sort of psychic pleasure."[54]

## 2. *Discussion*

We agree with Lowe that aggravated kidnapping requires the deprivation of a person's liberty for the purpose of obtaining a financial gain. (See *People* v. *Ordonez* (1991) 226 Cal.App.3d 1207, 1227 [277 Cal.Rptr. 382].)[55] However, nothing said by the prosecutor in his closing argument and nothing in the trial court's instruction that defined aggravated kidnapping suggested otherwise. Also, we find nothing in the legislative history of section 209 that supports Greenberger's contention that "reward" is limited to a public offer of money for the capture of a criminal or release of a kidnap victim.

Although not defined in the statute or in any California cases dealing with section 209, we conclude that the word "reward" is not a technical term requiring separate definition for the jury. The California statute relating to aggravated kidnapping is based upon the federal Lindbergh Law which was enacted in 1932. In the context of that statute the Supreme Court stated that "reward" generally "implies something given in return for good or evil done or received." (*Gooch* v. *United States* (1936) 297 U.S. 124, 126 [56 S.Ct. 395, 396, 80 L.Ed. 522].) This conforms with the common understanding of the word: "[S]omething given in return for good or, sometimes, evil, or for service or merit" (Webster's New World Dict. (3d college ed. 1991) p. 1150) or "something that is given in return for good or evil done or received and esp. that is offered or given for some service or attainment" (Webster's New

[53]Lowe's counsel took a position in the trial court different from his position here regarding the definition of "reward." In the trial court his position was similar to that taken by Greenberger here.

[54]Lowe also argues that CALJIC No. 9.53 as given permitted the jury to convict if a defendant actually received compensation whether or not that defendant had a prior expectation of such compensation. We reject this argument because it ignores that portion of the instruction which stated: "This act was done with the specific intent to hold or detain such person for reward, or to commit extortion or to exact from another person any money or valuable thing." For the same reason we also reject Lowe's contention that the modified version of CALJIC No. 9.55 was defective.

[55]In *People* v. *Ordonez, supra,* 226 Cal.App.3d at pages 1225-1227 we discussed the history of California and federal legislation relating to aggravated kidnapping. The prosecution theory of felony murder therein was based upon the felony of kidnapping for the purpose of ransom. We were not presented with nor did we consider issues relating to aggravated kidnapping for the purpose of reward.

Collegiate Dict. (8th ed. 1981) p. 985.) "There is no need to instruct a jury on the meaning of terms in common usage, which are presumed to be within the understanding of persons of ordinary intelligence." (*People* v. *Ordonez, supra,* 226 Cal.App.3d at pp. 1229-1230.) Since the word did not require definition and because the defendants made no request for a definition and failed to object when the prosecutor stated his definition in closing argument, we find no error in the trial court's decision not to define the word "reward."

### B. *Lesser Offenses to Aggravated Kidnapping*

#### 1. *Simple Kidnapping*

Greenberger, joined by her codefendants, argues that the trial court erred in failing to instruct on simple kidnapping as a lesser included[56] or lesser related offense to the charge of aggravated kidnapping. "Generally, the jury must be instructed on crimes that are necessarily included within the offense charged[.]" (*People* v. *Ordonez, supra,* 226 Cal.App.3d at p. 1233.) A trial court has the "duty to instruct sua sponte on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present, but has no such duty when there is no evidence that the offense was less than that charged." (*People* v. *Lewis* (1990) 50 Cal.3d 262, 276 [266 Cal.Rptr. 834, 786 P.2d 892].)

A discussion of this issue requires a brief review of proceedings that occurred before trial and the unusual circumstances that existed when the court was called upon to decide whether to instruct on the lesser included offense of simple kidnapping.

---

[56]Section 207 states in pertinent part: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

Simple kidnapping is not a lesser and necessarily included offense to a violation of section 209, subdivision (a) since the latter can be accomplished without asportation and the former cannot. (See *People* v. *Rayford* (1994) 9 Cal.4th 1, 12, fn. 8 [36 Cal.Rptr.2d 317, 884 P.2d 1369]; *People* v. *Bigelow* (1984) 37 Cal.3d 731, 755, fn. 14 [209 Cal.Rptr. 328, 691 P.2d 994]; *People* v. *Macinnes* (1973) 30 Cal.App.3d 838, 842-845 [106 Cal.Rptr. 589].) Respondent does not contest, however, Greenberger's argument that simple kidnapping was a lesser included offense to aggravated kidnapping in this case because the manner in which the information was pleaded (in count 2) incorporates asportation. We assume, without deciding, that this concession is correct.

The municipal court complaint charged each defendant with the murder of Radin.[57] Mentzer, Marti and Greenberger, who had their preliminary hearing before Lowe's, were charged in the superior court information with the murder of Radin and in a separate count with the kidnapping of Radin in violation of section 207. Greenberger, joined by Mentzer and Marti, moved to dismiss the kidnapping charge pursuant to section 995, arguing that it was barred by the statute of limitations. The People opposed the motion. The trial court agreed with the defendants' position, and that charge was dismissed. After Lowe's preliminary hearing, the People filed an amended information which added the charge of aggravated kidnapping in violation of section 209 as to each defendant.[58]

The defendants argue here that the trial court erred in granting their pretrial motion to dismiss the simple kidnapping charge. They are correct. An arrest warrant was issued with the complaint on September 28, 1988, charging each defendant with the murder of Radin. During the period relevant to these proceedings the statute of limitations for simple kidnapping was six years (§ 800). The prosecution for simple kidnapping would have had to commence on May 13, 1989, to avoid being barred by the statute of limitations. Section 803, subdivision (b) provides: "No time during which prosecution of the same person for the same conduct is pending in a court of this state is a part of a limitation of time prescribed in this chapter." Section 804 provides in part: "For the purpose of this chapter, prosecution for an offense is commenced when any of the following occurs: [¶] . . . [¶] (d) An arrest warrant or bench warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information or complaint." Although respondent argues that Radin's kidnapping cannot be characterized as the "same conduct" as the murder of Radin, we are satisfied that the facts herein clearly establish that the kidnapping was part of the same conduct that resulted in Radin's murder. (See *People* v. *Whitfield* (1993) 19 Cal.App.4th 1652, 1659-1660 [24 Cal.Rptr.2d 210]; *People* v. *Bell* (1996) 45 Cal.App.4th 1030, 1064 [53 Cal.Rptr.2d 156].) Since the prosecution commenced on September 28, 1988 with the issuance of the arrest warrant for the crime of murder and before the six-year statute of limitations had run for simple kidnapping, it was not barred.[59] We therefore agree with the defendants' argument on appeal that the trial court erred in granting their motion to dismiss the count charging a violation of section 207.

---

[57]For the sake of simplicity we have omitted from this discussion references to the charges relating to the murder of June Mincher and attempted murder of Christian Pierce.

[58]Pursuant to section 799, there is no statute of limitations for the crimes of murder and aggravated kidnapping.

[59]In opposition to the section 995 motion in the trial court the prosecution argued that the running of the statute of limitations had been tolled by the filing of the complaint in the municipal court. The prosecution erroneously relied upon section 804, subdivision (b) which

The effect of this error became manifest during discussion of jury instructions before argument when the trial court ruled on Greenberger's request to instruct on simple kidnapping (CALJIC No. 9.50) as a lesser included offense to the charge of aggravated kidnapping. The prosecutor responded: "I think the case law is very clear that the trial court should not instruct on a lesser included offense which is barred by the statute of limitations. . . ." Greenberger's counsel stated: "We may be willing to waive it for the purpose of the instruction." The prosecutor then cited cases to the court which stood for the then existing rule that the statute of limitations is jurisdictional and cannot be waived by a defendant.[60] Counsel for Greenberger argued: "I think that the defendant can waive the jurisdictional issue and by requesting the lesser included instruction we would be offering to do that." After a recess during which the trial court reviewed the cases cited by the prosecutor, the court ruled that it was "bound to follow the court of appeals opinions, and therefore, I will refuse the 9.50."[61] The other defendants then joined in the request for this lesser offense.

Greenberger, joined by the other defendants, argues on appeal: "The fact that neither the court nor counsel had correctly analyzed the statute of limitations issue during *pretrial* proceedings cannot in any way excuse the court's *subsequent* failure to instruct on simple kidnap during the crucible of trial."[62] Respondent argues that any error committed by the trial court by failing to instruct on the lesser offense was invited by the defendants and is therefore waived.

The trial court's mistaken belief that simple kidnapping was a time-barred lesser offense was the direct result of the successful arguments of Greenberger, Mentzer, and Marti to dismiss that charge prior to trial pursuant to section 995. During discussion of jury instructions no counsel attempted to correct the error, but instead talked in terms of waiving the statute of

provides that the filing of a misdemeanor complaint commences prosecution of the offense charged in the complaint. The significance of issuance of the arrest warrant as an event tolling the running of the statute pursuant to section 804, subdivision (d) was not argued.

[60]Those cases included: *People* v. *Vallerga* (1977) 67 Cal.App.3d 847 [136 Cal.Rptr. 429]; *Chaifetz* v. *United States* (D.C. Cir. 1960) 288 F.2d 133 [109 App.D.C. 349]; *Spaziano* v. *Florida* (1984) 468 U.S. 447 [104 S.Ct. 3154, 82 L.Ed.2d 340]; *People* v. *Diedrich* (1982) 31 Cal.3d 263, 283-284 [182 Cal.Rptr. 354, 643 P.2d 971]; and *People* v. *Brice* (1988) 206 Cal.App.3d 111 [253 Cal.Rptr. 370] (overruled by *Cowan* v. *Superior Court* (1996) 14 Cal.4th 367, 375 [58 Cal.Rptr.2d 458, 926 P.2d 438], see text).

[61]The trial court specifically relied upon *People* v. *Vallerga* and *People* v. *Brice* in refusing to instruct on the "time-barred" lesser offense.

[62]Greenberger, Lowe and Mentzer, citing *Spaziano* v. *Florida*, *supra*, 468 U.S. 447, argue that the trial court was required to accept their offer to waive the statute of limitations as to the time-barred lesser offense of simple kidnapping because this was a capital prosecution. The holding in *Spaziano* is applicable, however, only to capital offenses, and aggravated kidnapping is not such an offense.

limitations. We agree with respondent that the trial court error in ruling that the lesser offense of simple kidnapping was time-barred was invited by Greenberger, Mentzer, and Marti. ▮ "The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal." (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311]; see also *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1234-1236 [249 Cal.Rptr. 71, 756 P.2d 795]; *People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1011 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People* v. *Clark* (1992) 3 Cal.4th 41, 109; *People* v. *Cooper* (1991) 53 Cal.3d 771, 825-833.)

▮ We disagree with respondent, however, that the error was invited by Lowe. As discussed *ante*, Lowe did not participate in the section 995 motion to dismiss the simple kidnapping charge. Although he did join in the request that the court instruct on the time-barred lesser offense during the hearing in which the trial court considered Greenberger's offer to waive the statute of limitations, and his counsel never disputed the prosecutor's contention that the statute of limitations had run, we cannot conclude from this that his counsel's conduct invited the trial court's error.

▮ This is not the end of the issue, however, as to Greenberger, Mentzer and Marti. The Supreme Court in *Cowan* v. *Superior Court, supra*, 14 Cal.4th 367, decided five years after the instant trial, disapproved the body of law upon which the trial court relied in denying the request for the lesser offense. In *Cowan* the defendant was charged with murder and entered a guilty plea to the lesser offense of manslaughter, a crime for which the statute of limitations had run. Prior to sentencing, and upon motion of the prosecution, the trial court ruled that it lacked subject matter jurisdiction over the time-barred offense and set aside the plea, reinstating the original charge. The defendant sought a writ of mandate which was granted by the Supreme Court. The court overruled *People* v. *McGee* (1934) 1 Cal.2d 611 [36 P.2d 378] and its progeny which held that a court lacks fundamental subject matter jurisdiction over a time-barred criminal charge. (*Cowan* v. *Superior Court, supra*, 14 Cal.3d at p. 374.) In addition to holding that a defendant may enter a guilty plea to a time-barred lesser offense, the *Cowan* court went on to conclude that a defendant is entitled to an instruction on a time-barred lesser offense if he waives the statute of limitations. (*Id.* at p. 376.)

*Cowan* did not address whether the rule announced therein was to be given prospective or retroactive application. Because *Cowan* announced a change in the long-standing rule of criminal procedure relating to trial court jurisdiction over time-barred lesser offenses, we conclude that the fair administration of justice requires that the rule announced in *Cowan* be given

prospective application only, i.e., to cases tried after the date it was decided. Prospective application would conform with past decisions of the Supreme Court. (See *People* v. *Geiger* (1984) 35 Cal.3d 510, 532, fn 13 [199 Cal.Rptr. 45, 674 P.2d 1303] [rule regarding lesser related offenses to be prospective only]; *People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1012-1014 [258 Cal.Rptr. 821, 773 P.2d 172] [rule of imperfect self-defense was prospective].)

Because of its erroneous belief that the statute of limitations had run on simple kidnapping, the trial court herein was faced with the choice of following the existing rule and not instructing on the lesser offense or of instructing on the lesser offense with the prospect of a conviction on a lesser offense over which the court would lack subject matter jurisdiction. We conclude that the trial court did not err by following the then existing rule in refusing to instruct on the "time-barred" lesser offense of simple kidnapping as to Greenberger, Mentzer and Marti.

 Even though Lowe is not tainted on appeal with the error invited by his codefendants, we conclude that the trial court did not err in refusing his request to instruct on simple kidnapping. "[I]t has long been settled that the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense." (*People* v. *Kelly* (1990) 51 Cal.3d 931, 959 [275 Cal.Rptr. 160, 800 P.2d 516]; see also *People* v. *Barton* (1995) 12 Cal.4th 186, 196, fn. 5 [47 Cal.Rptr.2d 569, 906 P.2d 531]; *People* v. *Middleton* (1997) 52 Cal.App.4th 19, 30 [60 Cal.Rptr.2d 366].) The evidence presented at trial demonstrated either that Lowe was guilty of aggravated kidnapping or not guilty of anything. "Under no view of the evidence" was he guilty of simple kidnapping. (See *People* v. *Leach*, *supra*, 41 Cal.3d at p. 106.)

The day before the kidnapping Lowe was present at the meeting in Mentzer's apartment during which the plan to kidnap Radin was discussed. Mentzer stated he was being paid a "lot of money" by Greenberger for the job. Lowe was described by Mentzer in the meeting as the person who would drive Radin and Greenberger in the limousine to a location where he would permit Mentzer and Marti to enter and Greenberger to exit, and would then drive the forcibly detained Radin to the desert where Mentzer and Marti would try to extract information regarding the stolen drugs and money from him. Mentzer and Marti were to be armed with guns and explosives, which were plainly visible during the meeting. The scheme was executed as planned. Thereafter, Lowe received payment of money and a car. Lowe presented an alibi defense. There was insufficient evidence to support a simple kidnapping instruction as a lesser included offense as to Lowe.

Relying upon *People* v. *Geiger*, *supra*, 35 Cal.3d 510, Lowe also contends that the trial court should have instructed on simple kidnapping as a lesser related offense. Lowe made no such request to the trial court. His counsel joined in Greenberger's request for simple kidnapping as a lesser included offense. Although one can speculate that the trial court would have erroneously concluded that simple kidnapping also was time-barred as a lesser-related offense, the issue was never presented to the trial court for ruling. He has therefore waived the issue on appeal. "[H]ad defendant offered the argument [in the trial court] he would have provided an occasion to develop a record adequate for review. But as stated, he did not offer the argument below. Accordingly, he may not do so here." (*People* v. *Gordon*, *supra*, 50 Cal.3d at pp. 1251-1252.) Further, since Lowe's defense was complete denial of culpability, the trial court would not have been required to instruct on lesser related offenses. (*People* v. *Geiger*, *supra*, 35 Cal.3d at pp. 531-532.)

### 2. *Sufficiency of the Evidence*

Lowe contends that there was insufficient evidence to support his conviction for aggravated kidnapping. He contends that the prosecution failed to establish that he participated in Radin's kidnapping with the expectation of financial reward.[63]

As the Supreme Court has observed, the role of an appellate court in reviewing a claim of insufficiency of the evidence is limited. " 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citation.]' (*People* v. *Jones* (1990) 51 Cal.3d 294, 314 . . . .)." (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) The same standard applies whether the People relied on direct or circumstantial evidence. (*People* v. *Bean*, *supra*, 46 Cal.3d at p. 932.)

---

[63]See section XII. B.1., *supra*, for a summary of the evidence relating to Lowe's participation in the murder of Radin.

▆▆▆ The jury herein was instructed that a necessary element of aggravated kidnapping is the specific intent to hold or detain the victim "for reward or to commit extortion, or to exact from another any money or valuable thing."[64] Viewed in the light most favorable to the People, there was abundant evidence that Lowe aided and abetted in Radin's kidnapping both for the purpose of extortion and to be compensated. Lowe's contention that this evidence is insufficient is meritless.[65]

### 3. *False Imprisonment*

▆▆▆ Although they did not request such an instruction, the defendants contend that the trial court erred in not instructing the jury sua sponte on felony false imprisonment (§§ 236 and 237)[66] which is a lesser included offense to the charge of aggravated kidnapping (§ 209, subd. (a)). (*People* v. *Morrison* (1964) 228 Cal.App.2d 707, 713 [39 Cal.Rptr. 874].) We reject their argument for reasons related to the statute of limitations.

During the period relevant to these proceedings the statute of limitations for felony false imprisonment was three years (§ 801). As discussed *ante*, the prosecution herein did not commence until September 28, 1988, with the filing of a complaint and the issuance of an arrest warrant in the municipal court. At that time the statute of limitations for false imprisonment had already run since the crime occurred on May 13, 1983. Even if *Cowan* were to be given retroactive application, the trial court had no sua sponte duty to instruct on a time-barred lesser included offense unless the defendant affirmatively waived the statute of limitations. (*Cowan* v. *Superior Court, supra,* 14 Cal.4th at p. 376.) Although the defendants offered to waive the statute of limitations for simple kidnap, no such offer was made as to the lesser offense of false imprisonment. The trial court did not err in failing to instruct on felony false imprisonment.[67]

---

[64]See footnote 52 for the complete instructions given by the trial court defining aggravated kidnapping.

[65]Mentzer joined in Lowe's argument that there was insufficient evidence to support his conviction for aggravated kidnapping. We reject Mentzer's argument for the same reason.

[66]Section 236 provides: "False imprisonment is the unlawful violation of the personal liberty of another." Section 237 provides in part: "If such false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment in state prison."

[67]Greenberger's reliance on *People* v. *Lewis* (1986) 180 Cal.App.3d 816 [225 Cal.Rptr. 782] *is misplaced since the warrant in that case was issued before the statute of limitations for* the included offense had run.

### 4. *Issues Relating to Consent of the Victim*

■ Lowe contends that the trial court committed reversible error in refusing to give his requested instructions CALJIC Nos. 9.56 and 9.58.[68] He argues substantial evidence supported the giving of these instructions and failure to give them deprived him of his right to present a defense. Lowe argues specifically that there was substantial evidence that Radin voluntarily entered the limousine he was driving and that he believed Radin consented to being transported in the limousine. The trial court denied his request stating: "I think that the evidence cited by the defense is fanciful and doesn't require the instructions."

Although the evidence herein suggests that Radin voluntarily entered the limousine with Greenberger believing he was going to dinner, the overwhelming evidence also demonstrates that Radin was forcibly detained and transported to the place where he was ultimately murdered. Lowe's defense herein was alibi. The trial court's assessment was correct. There was no substantial evidence to support the instructions he requested. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Simmons* (1989) 213 Cal.App.3d 573, 579 [261 Cal.Rptr. 760]; *People* v. *Boyd* (1990) 222 Cal.App.3d 541, 557, fn. 14 [271 Cal.Rptr. 738].)

### 5. *Alibi Instructions*

We find no merit in Lowe's argument that the court's instructions relating to alibi permitted the jury to convict him even if the jury believed his alibi

---

[68]CALJIC No. 9.56 (5th ed. 1988 bound vol.) stated:

"When one consents to accompany another, there is no kidnapping so long as such condition of consent exists.

"To consent to an act or transaction, a person must

"1. act freely and voluntarily and not under the influence of threats, force, or duress;

"2. have knowledge of the true nature of the act or transaction involved; and

"3. possess sufficient mental capacity to make an intelligent choice whether or not to do something proposed by another person.

"[Mere passivity does not amount to consent.] Consent requires a free will and positive cooperation in act or attitude."

CALJIC No. 9.58 (5th ed. 1988 bound vol.) stated:

"It is a defense to the charge of kidnapping that a defendant lacked general criminal intent. There is no general criminal intent if a defendant entertained a reasonable and good faith belief that the person alleged to have been kidnapped voluntarily consented to accompany the defendant and to the movement involved in the purported kidnapping. If from all the evidence you have a reasonable doubt that the defendant harbored general criminal intent at or during the time of the movement, you must find [him] [her] not guilty of kidnapping."

defense.[69] The instructions were a correct statement of law and, viewed in the light of all the instructions given, posed no potential for confusion.

## C. *Murder*

In addition to first degree premeditated and deliberate murder, the jury was instructed on second degree felony murder based upon the predicate felonies of aggravated and simple kidnapping.[70] The jury was not instructed on manslaughter. Greenberger and Lowe contend that the trial court erred by instructing on second degree murder with the predicate felony of simple kidnapping which they argue is not a felony inherently dangerous to human life. They also contend the trial court erred in failing to instruct on manslaughter based on a predicate of false imprisonment. Mentzer and Marti argue that the trial court erred by not instructing on heat of passion manslaughter, unreasonable self-defense and the effects of intoxication.

### 1. *Simple Kidnapping as a Predicate for Second Degree Felony Murder*

■ During discussion of jury instructions the prosecution requested that the jury be instructed on second degree felony murder based only on the

---

[69]CALJIC No. 4.50, as modified, read as follows: "Evidence has been introduced in this case to the effect that one or more defendants was not present at the time of the commission of the alleged crime with which the defendants are charged. If, after a consideration of all of the evidence, you have a reasonable doubt that a defendant was present at the time the crime was committed, you must find him or her not guilty."

CALJIC No. 4.51, as modified, read as follows: "However, if the evidence establishes beyond a reasonable doubt that the defendant aided and abetted the commission of the crime charged in this case, the fact, if it is a fact, that he or she was not present at the time and place of the commission of the alleged crime for which he or she is being tried is immaterial and does not, in and of itself, entitle the defendant to an acquittal."

[70]Modified CALJIC No. 8.32 was given as follows:

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during or as the direct causal result of the commission of simple kidnap or kidnapping for reward or extortion as alleged in count 2 is murder of the second degree when the perpetrator had the specific intent to commit such crime.

"The specific intent to commit simple kidnap or kidnapping for reward or extortion as alleged in count 2 and the commission of such crime must be proved beyond a reasonable doubt.

"Every person who unlawfully and with physical force moves any other person without his consent or compels any other person, without his consent and because of a reasonable apprehension of harm, to move for a substantial distance, that is, a distance more than slight or trivial, is guilty of the crime of simple kidnap.

"In order to prove such crime, each of the following elements must be proved:

"1. A person was unlawfully moved by the use of physical force, or compelled by another person to move because of a reasonable apprehension of harm, and

"2. The movement of such person was without his consent, and

"3. The movement of such other person was for a substantial distance, that is, a distance more than slight or trivial."

predicate felony of aggravated kidnapping. Defendants Greenberger and Lowe, however, requested that the jury be instructed on simple kidnapping as a basis for second degree felony murder. The trial court expressed concern whether simple kidnapping was a felony inherently dangerous to human life which could support a conviction of second degree felony murder. Counsel for Lowe and Greenberger both answered that it was. Greenberger and Lowe now contend that the trial court erred in instructing that simple kidnapping could be a basis for the jury to return a verdict of guilty of second degree murder. We first observe, if the trial court erred in so instructing, such error was clearly invited by the defendants. (See *People* v. *Wickersham, supra*, 32 Cal.3d at p. 330; *People* v. *Bunyard, supra*, 45 Cal.3d 1189, 1234-1236; *People* v. *Kirkpatrick, supra*, 7 Cal.4th 988, 1011; *People* v. *Clark, supra*, 3 Cal.4th 41, 109; *People* v. *Cooper, supra*, 53 Cal.3d 771, 825-832; *People* v. *Ojeda-Parra* (1992) 7 Cal.App.4th 46, 50-51 [8 Cal.Rptr.2d 634]; *People* v. *Johnson* (1969) 271 Cal.App.2d 616, 625 [76 Cal.Rptr. 768].)

We conclude, however, that the trial court did not err in this regard. "A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder." (*People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) In *People* v. *Patterson* (1989) 49 Cal.3d 615, 620 [262 Cal.Rptr. 195, 778 P.2d 549] the court stated that for application of the doctrine of second degree felony murder, an inherently dangerous felony is "an offense carrying 'a high probability' that death will result.' " (*Id.* at p. 627.) In *People* v. *Ordonez, supra*, 226 Cal.App.3d 1207, 1228 we concluded that aggravated kidnapping is such a felony. Simple kidnapping has likewise been held to be a felony inherently dangerous to human life which may support a conviction of second degree felony murder. (*People* v. *Pearch* (1991) 229 Cal.App.3d 1282, 1298 [280 Cal.Rptr. 584].) Greenberger and Lowe argue that *Pearch* was wrongly decided and invite us to come to a contrary determination. Since we agree with the conclusion reached in *Pearch* we decline their invitation. We find no error in the trial court's instruction on second degree felony murder predicated on the felony of simple kidnapping.

### 2. *Voluntary Intoxication*

■ Mentzer, joined by Marti, argues that sufficient evidence was presented of his voluntary intoxication to raise a reasonable doubt of the existence of malice aforethought. He contends that the trial court erred in refusing instructions relating to voluntary manslaughter and the effects of intoxication. During discussion of jury instructions Mentzer pointed to evidence derived from the statements made by Lowe and Mentzer to Rider

supportive of his position.[71] The trial court stated: "I think the evidence is insubstantial on the issue. . . . As to Mentzer and Marti, the only statement that we have is that they really drank some wine to gear themself [*sic*] up to do the murder and I think that's insubstantial evidence to give the instruction."

We conclude that the trial court was correct in its analysis that the evidence relating to voluntary intoxication was insubstantial. The trial court should instruct the jury on every theory of the case, " 'but only to the extent each is supported by substantial evidence. [Citation.]' " (*People* v. *Flannel*, *supra*, 25 Cal.3d at pp. 684-685) The evidence relied upon by Mentzer does not meet that standard. The facts herein are similar to *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1180-1181 [270 Cal.Rptr. 286, 791 P.2d 965]. There the defendant had consumed eight to ten beers prior to the charged murder and the Supreme Court stated: "Because in this case there was no evidence presented at the guilt phase suggesting that defendant's drinking had affected his mental state in a manner that might negate the specific intent or mental state required for first degree murder, the trial court did not err in failing to instruct the jury pursuant to CALJIC No. 4.21 with regard to the first degree murder charge."[72] (*People* v. *Ramirez*, *supra*, 50 Cal.3d at p. 1181; see also *People* v. *Mills* (1977) 73 Cal.App.3d 539, 544 [140 Cal.Rptr. 803]; *People* v. *Juarez* (1968) 258 Cal.App.2d 349 [65 Cal.Rptr. 630].)

---

[71]"Lowe: Have you been with Bill on a homicide? You have not. The mother fucker gets drunk.

" . . . . . . . . . . . . . . . . . . . . . .

Lowe: Oh, I'm not saying who it was, I'm just saying the fucker gears himself up to get the balls to do it. And that ain't. . .

" . . . . . . . . . . . . . . . . . . . . . .

"Rider: *That's exactly what he said. He said you would have to get drunk to* _____
Menzer: Well we drank a little wine before that. Alex even drank a bunch of wine. We drank - we drank a whole bottle.

" . . . . . . . . . . . . . . . . . . . . . .

Rider: _____. But anyways, to get back to this bullshit, he said - he said he lost a great deal of respect for you because you had to get drunk.

"Mentzer: He's fuckin' crazy. Nah, I said listen - let's have a little wine because I was, you know, like to drink a little wine. What we didn't know was that there was somebody sitting there waiting to follow this guy in the limousine. Okay? A well known celebrity and a friend were waiting to follow the fat guy that night in the limousine. Alex and I pulled right up and parked right behind them. We were drinking a little wine and then we both had to piss. We got out of the car in the bushes and took a piss. It was so fuckin' funny."

[72]In the instant case the trial court went further than the court in *Ramirez* because it did instruct generally on the effect of voluntary intoxication in relation to specific intent, giving a portion of CALJIC No. 4.21 as follows: "If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether that defendant had the required specific intent and/or mental state. If from all the evidence you have a reasonable doubt whether a defendant formed the required specific intent and/or mental state you must find that he or she did not have such specific intent and/or mental state."

### 3. *Voluntary Manslaughter Based on Heat of Passion or Imperfect Self-defense*

Mentzer contends that the trial court erred by refusing to instruct on voluntary manslaughter based on heat of passion and imperfect self-defense or defense of another. He argues that there was sufficient evidence to support these instructions.[73]

As stated *ante*, a court need not instruct on lesser included offenses unless such offenses are supported by substantial evidence. (*People* v. *Flannel*, *supra*, 25 Cal.3d at pp. 684-685; *People* v. *Pride* (1992) 3 Cal.4th 195, 250 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People* v. *Rich* (1988) 45 Cal.3d 1036, 1112 [248 Cal.Rptr. 510, 755 P.2d 960]; *People* v. *Dixon* (1995) 32 Cal.App.4th 1547 [38 Cal.Rptr.2d 859]; *People* v. *Franco* (1994) 24 Cal.App.4th 1528, 1540 [30 Cal.Rptr.2d 478]; *People* v. *DeLeon* (1992) 10 Cal.App.4th 815, 824-825 [12 Cal.Rptr.2d 825]; *People* v. *Gaulden* (1974) 36 Cal.App.3d 942, 951 [111 Cal.Rptr. 803].) The evidence herein was minimal and insubstantial at best. The trial court did not err in refusing to instruct on manslaughter based on these theories.

### 4. *False Imprisonment as a Predicate for Involuntary Manslaughter*

Although she did not request such an instruction in the trial court, Greenberger contends that the court committed reversible error by failing to instruct sua sponte on involuntary manslaughter based on false imprisonment as a lesser included offense to the predicate felonies of aggravated and simple kidnapping. Greenberger contends that failure to so instruct precluded the jury from considering an involuntary manslaughter verdict and outright acquittal. Greenberger relies upon *People* v. *Turner* (1990) 50 Cal.3d 668 [268 Cal.Rptr. 706, 789 P.2d 887], *People* v. *Henderson* (1977) 19 Cal.3d 86 [137 Cal.Rptr. 1, 560 P.2d 1180], *People* v. *Glenn* (1991) 229 Cal.App.3d 1461 [280 Cal.Rptr. 609] and *People* v. *Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894]. Respondent argues that, because the evidence presented at trial showed that Greenberger was guilty of nothing less than aggravated kidnapping, the trial court had no sua sponte duty to instruct on manslaughter based upon the predicate of false imprisonment.

---

[73]Mentzer specifically points to Greenberger's testimony that Radin had been in a "boisterous kind of belligerent mood" the night of his kidnapping and that Radin had ingested cocaine that night. Mentzer also points to his statements to Rider that Radin "had a gun on him . . . [and] he was gonna shoot the chick. . . . [Radin] was gonna take her somewhere else, . . . take care of her that way." Mentzer also points to Greenberger's testimony that the day after the kidnapping Mentzer told Greenberger that Radin had a gun, and he was very angry and upset.

Involuntary manslaughter is the unintentional killing of a human being without malice, "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) In *People* v. *Burroughs, supra*, 35 Cal.3d at page 835 the court stated: "[A]n unintentional homicide committed in the course of a noninherently dangerous felony may properly support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection." Felony false imprisonment is not an inherently dangerous felony. (*People* v. *Henderson, supra*, 19 Cal.3d at p. 90.) False imprisonment is a lesser included offense of aggravated kidnapping. (*People* v. *Morrison, supra*, 228 Cal.App.2d at p. 713.)

Greenberger contends that the jury's verdict of second degree murder implies that the jury necessarily found that at most she participated as an aider and abettor in a false imprisonment without the intent to kill, which she argues is consistent with her testimony. From this Greenberger argues that, had the jury been instructed on the lesser offense of involuntary manslaughter based on the predicate of false imprisonment, there was a fair possibility that she would have been convicted of that offense. She contends that the jury may even have concluded that she acted with "due caution and circumspection" in trying to warn Radin of his impending doom, and the jury may well have acquitted her of homicide entirely.

We reject Greenberger's argument because it is premised on a faulty reading of the record. We are satisfied that the evidence demonstrates that she was either guilty of felony murder based on the predicate felony of kidnapping or not guilty of homicide. Her defense was that she believed that the other defendants were going to talk to Radin at the restaurant while she and Radin had dinner the night of Radin's murder. She denied any knowledge that they were going to detain or kidnap Radin. No evidence was presented from which a jury could conclude that she intended to participate in Radin's false imprisonment. There was a clear dichotomy in the evidence. The prosecution evidence supported the theory that Greenberger paid for the kidnapping of Radin in order to extract information from him. Greenberger's evidence supported her theory that she had no knowledge of the plans of the other defendants, and she did not share their intent. The evidence thus supported either a verdict that Greenberger was guilty of aggravated kidnapping or not guilty of anything. There was no evidence from which a jury could conclude that Greenberger was guilty of false imprisonment. There is no need for the court to instruct sua sponte unless substantial evidence

exists. (*People* v. *Flannel*, *supra*, 25 Cal.3d at pp. 684-685.) The evidence as to false imprisonment fails this test.[74]

## XIII., XIV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Lowe's judgment is modified by staying the sentence imposed for second degree murder until completion of the term imposed for aggravated kidnapping, at which time the stay is to become permanent, and, as modified, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment accordingly.

The judgments as to Greenberger, Mentzer, and Marti are affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied October 31, 1997, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme court was denied January 14, 1998.

---

[74] Lowe joins Greenberger's argument. We reject his argument for the same reason we concluded that the trial court did not err in refusing to instruct on the lesser included offense of simple kidnapping as to Lowe. There was no substantial evidence to support such an instruction.

*See footnote, *ante*, page 298.

## ATTACHMENT 1

### LOWE-RIDER CONVERSATIONS OBJECTED TO BY MENTZER

Lowe: I'm gonna tell you something and I'll tell you the honest truth.

Rider: I want you to be honest.

Lowe: I've been a couple times down the road and back up.

Rider: You've been around the block?

Lowe: **And - you know what? Have you been with Bill on a - on a - homicide?**

Rider: Huh?

Lowe: **Have you been with Bill on a homicide? You have not. The mother fucker gets drunk.**

Rider: Would I tell ya? Would I tell ya if I was?

Lowe: I don't know who it would be.

Rider: I know all about yours though.

Lowe: Huh?

Rider: Between you and me, I know all about yours.

Lowe: George?

Rider: Yours, your . . .

Lowe: **Oh, I'm not saying who it was, I'm just saying the fucker gears himself up to get the balls to do it. And that ain't . . .**

Rider: Well, let me tell you what he told me, . . .

Lowe: Almost fuckin' went down the . . .

Rider: Go ahead.

Lowe: Go ahead.

Rider: Well, he was talking about - he was talking about Radin, said you were really afraid on that one. Real afraid.

Lowe: It ain't true and I don't believe what . . .

Rider: Well, he did say it, he did say that.

Lowe: I didn't even do anything.

Rider: Okay.

Lowe: It wasn't me.

Lowe: All I know is Friday the 13th . . .

Rider: That's this Friday.

Lowe: Huh?

Rider: That's this Friday.

Lowe: **Friday the 13th they shot him 13 times.**

Rider: Well, you were there.

Lowe: I was there.

Rider: I - I know that. You were driving the car. Bobby, Bobby, Bobby, look at me. I'm smart, I ain't - I ain't going to say anything - I'm not - but I know. . . .

Lowe: No, I know, I know that you know most of it anyway. But its neither here nor there.

Rider: No, its not. But I know - I also know that you didn't get - that you didn't get reimbursed like you should.

Lowe: Oh, yeah, I got a lot. I didn't get near as much . . .

Rider: Huh?

Lowe: I know it. What was the payoff You don't know.

Rider: You know, I've heard two different stories. Yeah, please. Thanks a lot. No, wait a minute. I've heard three different stories on that. I think you told me a little bit about it. And I know what - the - I know what yours was

Lowe: What?

Rider: The caddie.

Lowe: it wasn't.

## ATTACHMENT 2

### MENTZER-RIDER STATEMENTS OBJECTED TO BY MARTI

Rider: You know on that one -uh- one thing up north - you know what he told me about you?

Mentzer: He don't know anything about _____

Rider: **The fat guy.**

Mentzer: Oh, that guy, yeah.

Rider: **He said that you were afraid** _____

Mentzer: Are you kidding?

Rider: Am I kidding?

Mentzer: I don't want to say anything else but, you know, that's too fuckin' crazy.

Rider: **That's exactly what he said, I said what do you mean? He was always the bravest.**

Mentzer: **You know what? Alex was scared shitless of me and he fuckin' better be.**

Rider: **That's exactly what he said. He said you would have to get drunk to**

Mentzer: **Well we drank a little wine before that. Alex even drank a bunch of wine. We drank - we drank a whole bottle.**

Rider: **He doesn't normally drink does he?**

Mentzer: **No.**

Rider: Hell, that was before the - uh . . .

Mentzer: That - that was a funny time, that was a funny night though.

Rider: Don't tell me his name.

Mentzer: No, you know what? You know Alex is full of shit. I'm the one who set the whole goddamn thing up.

Rider: **He was from New Jersey** _____ **the fat guy. Hey, Alex had a nick-name for him. Remember he used to joke about it? Rodan, Radin.**

Mentzer: **Oh, Radin, yeah,** _____.

Rider: But remember . . .

Mentzer: No - Larry - Larry did a piece on that.

Rider: _____. **But anyways, to get back to this bullshit, he said - he said he lost a great deal of respect for you because you had to get drunk**

Mentzer: He's fuckin' crazy. Nah, I said listen - let's have a little wine because I was, you know, like to drink a little wine. What we didn't know was that there was somebody sitting there waiting to follow this guy in the limousine. Okay? A well known celebrity and a friend were waiting to follow the fat guy that night in the limousine. Alex and I pulled right up and parked right behind them. We were drinking a little wine and then we both had to piss . We got out of the car in the bushes and took a piss. It was so fuckin' funny.

. . .

Rider: I thought you were talking about - cause I remember you were with Bob and you had hired an investigator. It might have been Pascal _____ ou were at - uh - this was in the first - I think it was Radin -when Radin went down, you passed this cop . . .

Mentzer: Oh.

Rider: You said "Freeze", and you said- and you were thinking about doing him, and he kept on following you around and _____

Mentzer: No, we were in - we were in the back of the limousine with -with -uh - Radin, and uh - and uh - we were on, we were on Sunset, and all of a sudden all these fuckin' sirens appear, all these fuckin' sirens, we were freakin' out, we were all freakin' out. And all - all of a sudden all of these cops were shooting by us.

Rider: **And who's in - you and Alex are in the back with Radin** and Bobby was driving _____

Mentzer: Yeah, you know, Bob said his fuckin' heart damn near jumped out of his fuckin' chest.

Rider: Well, I mean, what were they running after?

Mentzer: The cops had a call, they were going somewhere.

Rider: And you - you thought they were coming after you guys?

Mentzer: Yeah.

Rider: Did - did Radin try to get out or something?

Mentzer: No, he had a gun on him though. He was gonna shoot - he was gonna shoot the chick.

. . .

Rider: So then what did Radin do? Did he go for his piece as soon as you guys jumped in the car or what?

Mentzer: No, he was a wimp.

Rider: He didn't go for his gun?

Mentzer: A 300 pound wimp.

Rider: What kind of gun did he have?

Mentzer: Uh - a twenty - two.

Rider: **That's why he didn't go for it, huh? Was Alex funny?**

Mentzer: **Yeah.**

Rider: **Started hollering and screaming?**

Mentzer: **Uh - no, not really.**

. . .

Rider: I would have fuckin'- my heart would have come out of my mouth in the back of the limousine with all those cops behind me turning their sirens - that's like a movie, isn't it?

Mentzer: **Ya know what? Man, it was pretty fuckin' funny.**

Rider: **Well, how did Alex behave?**

Mentzer: **You know, we were on the floor.**

Rider: **What were you doing on the floor?**

Mentzer: **Well, I was - I was on the seat, Alex was on the floor.**

Rider: **What was he doing on the floor?**

Mentzer: **Had his gun in his mouth. He says - Alex told him, you know, make one move.**

Rider: **Oh, Radin was on the floor too?**

Mentzer: **No, Radin was sitting in the seat. Alex was on the floor with a gun pointed right near Radin's crotch, stuck it right in his crotch.**

Rider: _____

Mentzer: **I told him, I said, "Say one word - you're gonna lose everything pal." Pretty funny.**

## ATTACHMENT 3

### MENTZER-RIDER STATEMENTS OBJECTED TO BY LOWE

Rider: Did you see him? Why didn't you - why didn't you and uh . . .

Mentzer: We had no idea that they were - we just thought that they were sitting there.

Rider: Oh, you didn't know they were . . .

Mentzer: They were both black. We thought they were a couple sitting in the car, cause, you know, it was dark. In that area you see a lot of people sitting around in cars and shit.

Rider: Well, who was driving, who was driving the limousine?

Mentzer: Uh - yours truly.

Rider: You were the limo driver?

Mentzer: No, no. **That was Bob.**

Rider: **Oh, Bob.** I - but he knew - he knew you guys.

Mentzer: Who - Radin? I never met Radin in my life.

Rider: Oh.

Rider: I thought you were talking about - cause I remember you were with Bob and you had hired an investigator. It might have been Pascal _____ ou were at - uh - this was in the first - I think it was Radin -when Radin went down, you passed this cop . . .

Mentzer: Oh.

Rider: You said "Freeze", and you said- and you were thinking about doing him, and he kept on following you around and _____

Mentzer: No, we were in - we were in the back of the limousine with -with -uh -Radin, and uh - and uh - we were on, we were on Sunset, and all of a sudden all these fuckin' sirens appear, all these fuckin' sirens, we were freakin' out, we were all freakin' out. And all - all of a sudden all of these cops were shooting by us.

Rider: And who's in - you and Alex are in the back with Radin and **Bobby was driving**

Mentzer: **Yeah, you know, Bob said his fuckin' heart damn near jumped out of his fuckin' chest**

Rider: Well, I mean, what were they running after?

Mentzer: The cops had a call, they were going somewhere.

Rider: And you - you thought they were coming after you guys?

Mentzer: Yeah.

Rider: Did - did Radin try to get out or something?

Mentzer: No, he had a gun on him though. He was gonna shoot - he was gonna shoot the chick.